# 26-960-cr (L)
# 26-1289-cr (Con.)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

-v-

KRIS ROGLIERI,

Defendant-Appellant.

On Appeal from the United States District Court
For the Northern District of New York

**Brief for Defendant-Appellant**
**Kris Roglieri**

James P. Egan
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

## Table of Contents

Table of Authorities ........ iii

Jurisdictional Statement ........ 1

Statement of the Issues Presented ........ 1

Statement of the Case ........ 2

A. Kris Roglieri rises from modest origins, builds a successful commercial lending business, and becomes a charitable member of his community. ........ 3

B. Roglieri's plan to provide large commercial loans fails. ........ 5

C. Roglieri pleads guilty to wire fraud. ........ 8

D. The district court imposes a sentence of 97 months' imprisonment. ........ 10

D. The district court issues an amended judgment increasing the amount of restitution. ........ 17

Summary of the Argument ........ 18

Argument ........ 23

I. The district court's imposition of a 97-month sentence was procedurally and substantively unreasonable. ........ 23

A. Standard of Review ........ 23

B. Discussion ........ 25

1. The district court committed procedural error in calculating Roglieri's Guidelines range. ........ 25

a. The aggravating role adjustment U.S.S.G. § 3B1.1(c) does not apply. ........ 25

b. The district court erred by failing to apply the two-level zero-point offender reduction of U.S.S.G. § 4C1.1. ........ 28

2. The district court imposed a substantively unreasonable sentence by relying on an erroneous assessment of Roglieri's conduct and sentencing him within a Guidelines range driven by a flawed loss enhancement that failed to account for his other mitigating evidence....28

a. The district court based its sentence on a misunderstanding of Roglieri's offense and a failure to account for the considerable mitigating evidence reducing his culpability and the need for punishment. ....32

b. The district court failed to carefully treat the loss enhancement of U.S.S.G. § 2B1.1....38

II. The district court abused its discretion by including pre-offense expenses in the restitution order for V-9. ....45

A. Standard of Review....45

B. Discussion ....46

Conclusion ....49

Certificate of Compliance....50

Certificate of Service ....51

## Table of Authorities

### Cases

*Gall v. United States*, 552 U.S. 38 (2007) ................................ 25, 26, 41

*Peugh v. United States*, 569 U.S. 530 (2013) ........................................ 32

*Securities and Exchange Commission v. Reign Financial International, LLC, et al.*, No. 1:26-cv-23237 (S.D. Fla. 2026) ................................ 35

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........... 44

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ................ 45, 46

*United States v. Booker*, 543 U.S. 220 (2005) ....................................... 25

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ........ 25, 26, 27, 47

*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) ............................. 39

*United States v. Daramola*, 2024 WL 4241840 (D.N.M. Sept. 19, 2024) ...................................... 31

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013) ...................... 51

*United States v. Ebbers*, 458 F.3d 110 (2d Cir.2006) ........................... 50

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ................................................ 44

*United States v. Gupta*, 924 F. Supp. 2d 349 (S.D.N.Y. 2012) ........ 43-44

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ............................. 27

*United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) ............................. 48

*United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007) ......................... 49

*United States v. Park*, 758 F.3d 193 (2d Cir. 2014) .............................. 39

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ............. 45

*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ..................... 25

*United States v. Rivernider*, 828 F.3d 91 (2d Cir. 2016) ...................... 49

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir.2007) ........................ 50

*United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) ............................ 39

*United States v. Solis*, 18 F.4th 395 (2013) .......................................... 33

*United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) ................ 45

**Statutes**

18 U.S.C. § 1343 .......... 1, 2, 9, 20
18 U.S.C. § 1349 .......... 1, 2, 9, 20
18 U.S.C. § 3231 .......... 1
18 U.S.C. § 3553 .......... 13, 25, 41, 45
18 U.S.C. § 3663A .......... 49
18 U.S.C. § 3664 .......... 49
18 U.S.C. § 3742 .......... 1
28 U.S.C. § 991 .......... 40
28 U.S.C. § 994 .......... 40
28 U.S.C. § 1291 .......... 1

**Sentencing Guidelines**

U.S.S.G. § 2B1.1 .......... 11, 40, 44
U.S.S.G. § 2F1.1 .......... 42
U.S.S.G. § 2X1.1 .......... 11
U.S.S.G. § 3B1.1 .......... 11, 12, 15, 22, 27, 28, 31
U.S.S.G. § 3B1.1, cmt. 4 .......... 29
U.S.S.G. § 3E1.1 .......... 11
U.S.S.G. § 4C1.1 .......... 12, 22, 30
U.S.S.G., Ch. 1 Pt. A .......... 41
U.S.S.G., Ch. 1, intro., pt. 4 .......... 42

**Other**

O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 1692008 WL 2201039 .......... 45

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988) .......... 41

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007) ................................................................ 43

U.S. Securities and Exchange Commission, Litigation Release No. 26552, May 12, 2026, *Securities and Exchange Commission v. Reign Financial International, LLC, et al.*, No. 1:26-cv-23237 (S.D. Fla. Filed May 7, 2026) ........................................................................ 6, 35

David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ........ 43

## Jurisdictional Statement

This consolidated appeal is taken from a judgment (26-960-cr) and an amended judgment (26-1289-cr) of conviction entered against the Defendant-Appellant Kris Roglieri in the United States District Court for the Northern District of New York, by the Honorable Mae A. D'Agostino, United States District Judge, on April 6, 2026 and May 5, 2026, respectively. A 254, 272.[1] The district court had subject matter jurisdiction, pursuant to 18 U.S.C. § 3231, because this was a criminal case alleging a violation of 18 U.S.C. §§ 1343, 1349. A 21. Jurisdiction is invoked in this Court pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Notices of appeal were timely filed on April 13, 2026, and May 6, 2026, respectively. A 261, 280.

## Statement of the Issues Presented

1. Whether the district court's imposition of a 97-month term of imprisonment following Kris Roglieri's conviction for conspiracy to commit wire fraud was (1) procedurally unreasonable when the district court's misapplied a two-level role adjustment and failed to apply the

[1] Citations to the Appendix are to the page numbers inserted therein.

two-level zero-point offender adjustment; and (2) substantively unreasonable when the district court failed to account for Roglieri's genuine business failure, victimization, and honest efforts to fund the loans; overemphasized how he spent proceeds of the fraud; gave little weight to his history of charitable acts; and placed greater weight on the loss amount than the factor could bear.

2. Whether the district court erred in ordering Roglieri to pay restitution for expenses a victim incurred prior to and independently from any fraudulent conduct.

## Statement of the Case

This appeal follows the prosecution of Kris Roglieri for conspiracy to commit wire fraud. On November 13, 2025, Roglieri pled guilty to Count One of a six-count superseding indictment, charging violations of 18 U.S.C. §§ 1343, 1349. The district court sentenced him on April 3, 2026, to 97 months' imprisonment and three years' supervised release. Roglieri filed a timely notice of appeal on April 13, 2026, to challenge the prison sentence imposed in the original judgment.

The original judgment included an order to pay a total of $21,480.100 in restitution to eight victims. After the parties submitted supplemental letters concerning the amount of restitution Roglieri owed to a ninth victim, V-9, the district court issued an amended judgment on May 5, 2026, requiring Roglieri to pay a total of $31,280,426. Roglieri filed a timely notice of appeal on May 6, 2026, to challenge the amount of restitution he was ordered to pay V-9. The two cases have been consolidated.

## A. Kris Roglieri rises from modest origins, builds a successful commercial lending business, and becomes a charitable member of his community.

Prior to his instant arrest, Kris Roglieri, a lifelong New Yorker, was a 44-year-old father of two teenage children with no prior criminal history. PSR ⁋ 107.[2] Roglieri rose from modest beginnings, which included living for a time in a shelter after his parents separated, to build successful brokerage and lending companies. PSR ⁋ 106.

---

[2] The Presentence Report (PSR) and the district court's written statements of reasons have been submitted under separate cover.

In 2000, he founded an e-commerce site, which he sold in approximately 2006. A 148. Later that year, he founded Prime Commercial Lending, LLC, which conducted small balance lending for commercial real estate projects. PSR ⁋ 119. In 2009, he founded Commercial Capital Training Group, LLC, a commercial loan broker training company. PSR ⁋ 118. During the pandemic, Roglieri's primary business was chosen by the Small Business Administration to facilitate the financing of PPP loans through the COVID pandemic between 2020 and 2022. A 140; PSR ⁋ 119. In all, Roglieri's companies helped over 100,000 businesses and real estate investors. A 140.

As Roglieri became more successful, he sought to use his time and money to help others. For example, Roglieri "generously funded free turkey giveaway programs in the South End, initiatives that [assisted] over 2,000 families" and personally assisted at free Thanksgiving dinners. A 149-50. He also set up yearly fundraisers at the Children's Hospital, bought meals for doctors and nurses during the COVID pandemic, sponsored local youth sports teams, donated to the Marine

Corps, provided thousands of dollars in gift cards, and brought children to see classic cars through the Ronald McDonald house. A 152.

**B. Roglieri's plan to provide large commercial loans falls short.**

Roglieri entered the world of private placement investment for large commercial lending around 2021. Through newly formed business connections, he planned to leverage client funds to access a large reservoir of money for various projects, especially large commercial real estate and construction loans. A 123.

To accomplish this plan, Prime Capital Ventures, LLC (Prime Capital or PCV), which consisted of Roglieri, Kimberly Humphrey, and Christopher Snyder, entered into funding agreements pursuant to which clients, after paying due diligence fees of $25,000 to $75,000, would transfer so-called Interest Credit Account (ICA) payments to Prime Capital. A 42-43. The amount of this upfront payment varied by the size of the loan, but could be as large as $20 million. A 43. These payments were intended to serve as collateral and pre-payment interest through the life of the loan. A 43. Prime Capital then entered into separate agreements pursuant to which a portion of the money would be

transferred to third-party hedge funds, which in turn agreed to provide him with access to upwards of $500 million that Roglieri could use to fund his clients' projects. A 122-30.

To attract potential investors, Prime Capital posted a video falsely claiming that it had funded a $188 million hotel project in Atlanta, Georgia. PSR ⁋ 15. To further promote the project, Roglieri paid a third party to serve as a reference for Prime Capital. PSR ⁋ 15.

Unfortunately, Roglieri was never able to secure funding for Prime Capital's loan obligations. This was because Reign Financial and Berone Capital were committing a fraudulent investment scheme on Roglieri involving purported high-yield investment programs. *See* U.S. Securities and Exchange Commission, Litigation Release No. 26552, May 12, 2026, *Securities and Exchange Commission v. Reign Financial International, LLC, et al.*, No. 1:26-cv-23237 (S.D. Fla. Filed May 7, 2026), available at https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26552-0 (last visited Aug. 10, 2026) ("SEC Litigation Release").[3] Pursuant to

[3] Curiously, the complaint in *Securities and Exchange Commission v. Reign Financial International, LLC, et al.*, No. 1:26-cv-23237, was filed on May 7, 2026, two days after the amended judgment was issued in this case. A 272.

separate agreements, Prime Capital wired $20 million to Reign Financial and Berone Capital, a financial institution and hedge fund, for the purpose of accessing funds for Prime Capital's clients. A 44, 125-30. However, the $20 million was diverted and Prime Capital never secured funding. A 130-31. Moreover, for more than a year, Roglieri was lulled into believing that he would eventually have access to the promised pool of funding. A 132-37.

Nevertheless, Prime Capital continued to promote its ability to provide funding, to enter into loan agreements, and to accept ICA payments, even as it had lacked the present ability to obtain funding. Because Prime Capital was unable to secure funding, it used ICA payments from newer borrower clients to service older borrower clients. A 44.

Meanwhile, Roglieri, who sought to promote Prime Capital's success, used some of the ICA payments for himself. He bought several luxury cars and watches and took a vacation by private jet. A 44.

### C. Roglieri pleads guilty to wire fraud.

On June 12, 2025, a grand jury returned a six-count superseding indictment. A 21. Count One charged Roglieri with conspiracy to commit wire fraud from March 2022 through January 2024, in violation of 18 U.S.C. §§ 1343 and 1349. Counts Two through Six charged specific acts of wire fraud, in violation of 18 U.S.C. § 1343. A 29-30.

Roglieri pled guilty to Count One on November 13, 2025, pursuant to a written plea agreement. A 35. As summarized in the factual basis, Roglieri and his co-conspirators claimed that Prime Capital "had the present ability to make large commercial loans, including loans in the tens of millions of dollars, through funding agreements with third-party hedge funds." A 41-42. Through his plea, Roglieri admitted knowing that "Prime Capital had obtained no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources and funding agreements." A 42.

Roglieri and his co-conspirators made several relevant claims about the nature of the ICA. First, they assured borrowers that the ICA served

as collateral for the loan. Second, it acted as "pre-paid interest reserves," against which a borrower could draw to satisfy future interest payments. Third, the ICA was placed in a "pledged account," and would be refundable if Prime Capital did not secure a loan. A 43.

Roglieri admitted that these statements were false and fraudulently omitted material information. A 43. Instead of using the funds for their stated purpose, Roglieri "and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to, older clients." A 44. Roglieri "also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service), enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic international travel by private jet." A 44.

Throughout the conspiracy, Roglieri obtained more than $55 million from due diligence fees and ICA payments made by more than a dozen victim borrowers. In addition to a money judgment equaling the amount of losses arising from his offense, Roglieri agreed to forfeit 12

luxury cars, a Ferrari engine table, seized U.S. currency, eight luxury watches, and a house purchased for co-conspirator Humphery. A 36-38.

### D. The district court imposes a sentence of 97 months' imprisonment.

The Probation Office prepared a Presentence Report (PSR) in anticipation of sentencing, which calculated a Guidelines range of 97 to 121 months' imprisonment based on a Total Offense Level 30 and a Criminal History Category I. Roglieri's Total Offense Level comprised a Base Offense Level of 7, pursuant to U.S.S.G. §§ 2B1.1, 2X1.1(a), to which the Probation Office added a 22-level enhancement for the loss amount, pursuant to U.S.S.G. § 2B1.1(b)(1)(L); a two-level enhancement for 10 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i); a two-level role adjustment, pursuant to U.S.S.G. § 3B1.1(c); and a combined three-level reduction for accepting responsibility and timely pleading guilty, pursuant to U.S.S.G. §§ 3E1.1(a), (b). PSR ¶¶ 84-94.

The district court held a sentencing hearing on April 3, 2026. A 189. The government requested a sentence at the high end of the Guidelines range. A 78, 205. It relied to a considerable extent on the total loss amount, the number of victims involved, and the impact on the victims.

A 104-05, 205-08. In further support, the government cited the need for general deterrence, which the government contended was particularly acute in fraud cases. A 106, 208. Though not explaining how, the government contended that Roglieri's "desire for wealth and depravity" further demonstrated his "need for rehabilitation" and necessitated a lengthy term of imprisonment. A 107.

For his part, Roglieri sought a sentence of no more than 72 months' imprisonment. As an initial matter, Roglieri objected to the application of the two-level aggravating role adjustment of U.S.S.G. § 3B1.1(c) because, even if he took a larger share of the proceeds, his role in the conspiracy was no greater than Humphery or Snyder and he lacked exclusive control over them. PSR pp. 42-43; A 192. Absent the aggravating role adjustment, Roglieri contented that he would be eligible for the two-level zero-point offender adjustment of U.S.S.G. § 4C1.1. Incorporating these alterations would reduce Roglieri's Total Offense Level to 26 and his Guidelines range to 63 to 78 months' imprisonment.

Even aside from these Guidelines provisions, Roglieri argued that a below-Guidelines sentence was necessitated by the factors of 18 U.S.C.

§ 3553(a). While in no way attempting to excuse his conduct, Roglieri explained that he did not set out with a criminal intent. He sincerely believed that he could leverage borrowers' initial payments to tap into a much larger funding reservoir based on his anticipated access to private trading platforms and lucrative investment strategies. A 120. The success of that plan hinged on Roglieri's ability to secure funding from two lenders. A 120. Roglieri demonstrated that he wired $20 million in October 2022 pursuant to an agreement that would have ultimately allowed him access to $500 million. A 122-30. Instead, Roglieri was himself defrauded, lost the $20 million, and was unable to secure funding. A-130-33. Not only that, Roglieri was repeatedly assured by the purported lenders through 2023 (and even into 2024) that alternative solutions would be found to provide funding to Prime Capital. A 132-34.

Roglieri also sought to contextualize his use of borrowers' funds to make luxury expenditures on himself. First, even before founding Prime Capital, Roglieri was successful and obtained expensive items, including luxury watches and valuable cars. A 145. Wealth acquisition, therefore, was not the sole motive for Roglieri's offense. Second, Roglieri's pace of

spending had slowed as his business prospects deteriorated. A 145. Third, Roglieri spent what he believed he would have eventually earned in commissions had he been able to secure funding. A 146.

In further support of a sentence below the Guidelines range, Roglieri highlighted his history and characteristics. This included his modest upbringing, family support, prior businesses successes, generosity, and considerable history of community service and charity. A 147-53. He also drew the court's attention to the fact that he agreed almost entirely with the government's restitution requests. A 217.

Finally, Roglieri highlighted the flaws inherent in the Guidelines for white-collar crimes and noted that his requested sentence was in line with those of others convicted of similar offenses. A 153-60.

After hearing from the parties, the district court calculated a Guidelines range of 97 to 121 months' imprisonment. As relevant here, the district court denied Roglieri's Guidelines objections, applied the aggravating role adjustment, and declined to apply the zero-point offender adjustment. According to the district court, the aggravating role adjustment was appropriate because Roglieri received "the lion's share of

the fraud proceeds," "signed the line of credit agreements with the victims," "deposited funds in various bank accounts and conducted the wire transfers of funds," bought a house for Humphrey, and controlled Humphrey's conduct on one occasion. A 201-04. The district court also declined to apply the zero-point offender adjustment, which is inapplicable if the defendant received a role adjustment under § 3B1.1. A 204. The court also found that the zero-point offender adjustment was unwarranted because the Probation Office found that his offense caused substantial hardship. A 204.

The district court then imposed a sentence of 97 months' imprisonment and three years' supervised release. Following the government's lead, the district court placed significant weight on the nature of Roglieri's offense and the amount of the resulting loss. A 229-34. In doing so, the district court discounted Roglieri's own victimization and incorrectly assumed Roglieri only intended to obtain a $20 million line of credit, instead of the $500 million promised by Reign and Berone:

> And although I'm being asked to believe that Mr. Roglieri's troubles began when Reign and Berone failed to come through with a $20 million loan to him, neither Berone nor Reign were indicted as part of this case. That doesn't

> mean that they may not be indicted. I just don't know. But I have no proof other than what defense counsel has presented to me and what it learned in the civil -- and what I learned in the civil action as to whether Berone or Reign in fact defrauded the defendant.
>
> However, even if that's true, even if I accept that as true, that the defendant was defrauded out of $20 million, that money could not possibly have funded all of the loan agreements that the defendant made. And he knew that. . . .
>
> Any purported fraud by Berone or Reign certainly does not negate the defendant's own fraud for which he is being sentenced today. And again, I truly believe that even if Berone and/or Reign had come through on that line of credit, this would still be a major fraud. . . .
>
> I don't think Berone and Reign are an important part of your story, even assuming they failed to come through with that $20 million line of credit for you.

A 231-32.

Based on this misunderstanding, the district court found that Roglieri "set up his companies with a purpose to defraud." A 229.

Of further importance to the district court was the purported motivation underlying Roglieri's offense. Relying again on its misunderstanding of Prime Capital's agreements with Reign and Berone, the district court characterized Roglieri as "the face of a bottomless pit of greed," A 233, who engaged in "crude, audacious and greed-driven

conduct." A 237. Additional weight was placed on the effect Roglieri's conduct had on his victims:

> While one victim was firing employees, the defendant was buying a Rolex watch. While another victim was renting out their home to strangers, Defendant was purchasing a multi-million-dollar Virginia Beach house for another co-conspirator to live in. While a victim was liquidating his retirement accounts, the defendant was purchasing $101,000 of private jet services for a round-trip private air travel between Albany and Anguilla.

A 240-41.

Against these aggravating factors, the district court gave little consideration to Roglieri's mitigation circumstances. The court noted that Roglieri had no criminal history, submitted letters of support, and had exhibited "past generosity and other acts of kindness." A 241.

Based on the parties' agreement concerning eight victims, the district court also ordered restitution to eight victims in a total amount of $21,480,100. A 259.

### E. The district court issues an amended judgment increasing the amount of restitution.

As the district court directed at the sentencing hearing, the parties submitted letters outlining their respective positions as to the unresolved restitution claim of V-9. The government sought $9,800,324, which included the combined ICA payment and due diligence fee, losses for "engineering and architecture services as well as legal fees for the project." A 262-63. By contrast, Roglieri offered to pay $5 million as "a fair and just amount taking into account potential interest and conservative returns on investment from the $4,312,500.00 between April 6, 2023 and today." A 265.

In a written order issued on April 27, 2026, the district court directed Roglieri to pay V-9 restitution in the amount of $9,800,326. A 269. According to the district court, V-9's losses included the amount it paid on the loan it took out to fund the initial payment to Prime Capital and "the money spent on legal fees, environmental tests, and property assessments before V-9 entered into a contract with Prime Capital" because "V-9 would not have taken out the loan or undertaken any of

those expenses if it knew Defendant's conduct was fraudulent." A 270, 277.

## Summary of the Argument

This appeal arises from Kris Roglieri's conviction for conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. Roglieri's offense followed a successful two-decade career in business. Around 2021, he founded Prime Capital and entered the world of private placement investment for large commercial lending. He planned to draw from a high-yield investment program to provide loans for his clients' commercial projects. To accomplish this goal, Prime Capital obligated clients to provide a portion of the total anticipated loan amount upfront. Prime Capital assured its clients that the funds would remain in a secure account to serve as collateral and pre-payment of interest.

Without his clients' full agreement, Prime Capital wired $20 million provided by clients to access a $500 million pool of investment funds promised by two entities – Reign Financial and Berone Capital. Unbeknownst to Roglieri, these entities were perpetrating a high-yield investment scheme – a fact for which substantial evidence was presented

at sentencing, but which the government only acknowledged in filings two days after the amended judgment was entered in this case. Reign and Berone diverted the $20 million dollars to their own use, failed to provide funding to Prime Capital, and lulled Roglieri for more than a year into believing the promised funding was imminent. Consequently, Prime Capital was never able to satisfy its loan obligations.

As Roglieri scrambled to secure funding and meet his crushing obligations, Prime Capital continued to enter into new loan agreements and accept funds from new clients. In doing so, he misrepresented Prime Capital's ability to obtain funding, falsely claiming that Prime Capital had the present ability to make large commercial loans. He also diverted newer client funds to satisfy the obligations of older clients. Still believing that he would obtain the promised funding, he advanced himself a commission and spent lavishly on sports cars, watches, and a vacation by private jet. All told, the losses resulting from Roglieri's offense totaled more than $55 million.

This appeal challenges the district court's imposition of a 97-month sentence and the amount of restitution Roglieri was ordered to pay one of the victims.

**I.**

In sentencing Roglieri to serve 97 months in prison, the district court committed two procedural errors. First, the court miscalculated Roglieri's Guidelines range by imposing a two-level adjustment under U.S.S.G. § 3B1.1(c) for Roglieri's role in the offense. Contrary to the district court's conclusion, Roglieri claimed no "right" to a greater share of Prime Capital's ill-gotten funds and exercised no greater control over any other person involved in the offense. Second, the district court erred in failing to apply the two-level zero-point offender reduction of U.S.S.G. § 4C1.1 both because Roglieri should not have received a role adjustment under U.S.S.G. § 3B1.1 and because he did not *personally* cause substantial financial hardship.

Beyond these procedural errors, the district court's selection of a 97-month sentence was substantively unreasonable. As Roglieri demonstrated below, his offense stemmed from a failure to secure the

funding promised by two third parties, Reign and Berone. Indeed, Roglieri provided extensive documentation establishing that this failure was the result of a high-yield investment scheme perpetrated by Reign and Berone, who diverted the $20 million provided by Prime Capital, failed to meet its obligations to provide funding, and lulled Roglieri for more than a year into believing funding was forthcoming. Despite this clear evidence, which was subsequently verified through SEC action, the district court selected a 97-month sentence on the mistaken belief that Roglieri was not defrauded and was denied access to a line of credit worth $20 million, not the promised $500 million. Instead of sentencing Roglieri, the district court sentenced its own caricatured version of a "bottomless pit of greed" who devised a scheme to defraud clients from the very start. What is more, the district court failed to account for Roglieri's considerable history of charitable acts and sentenced him within a Guidelines range driven almost exclusively by a flawed loss enhancement. Because the district court's selection of a 97-month sentence was based on a misunderstanding of Roglieri and the nature of

the offense, factors that cannot bear the weight assigned them, this Court should vacate the judgment and remand for plenary resentencing.

## II.

The district court also erred by including expenses incurred by V-9 prior to entering into agreements with Prime Capital. V-9 sought to develop affordable housing. It engaged legal assistance and conducted site preparation prior to entering into agreements with Prime Capital. The district court incorrectly concluded that these expenses were losses caused by Roglieri because V-9 would not have undertaken these steps had they known Roglieri's conduct was fraudulent. But Roglieri is only responsible for losses that were the "result of the fraud." Because none of the expenses V-9 incurred prior to contracting with Prime Capital were the result of the fraud, this Court should remand for resentencing on the restitution award for V-9.

# Argument

## I. The district court's imposition of a 97-month sentence was procedurally and substantively unreasonable.

### A. Standard of Review

In the wake of *United States v. Booker*, 543 U.S. 220, 261 (2005), this Court reviews sentences for procedural and substantive reasonableness. *See United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 45 (2007)).

In assessing procedural reasonableness, this Court examines whether the district court (1) identified the incorrect Guidelines range, (2) treated the Guidelines as mandatory, (3) failed to consider the Guidelines along with the factors listed in 18 U.S.C. § 3553(a), (4) selected a sentence based on clearly erroneous facts, or (5) failed to adequately explain the sentence. *Gall*, 552 U.S. at 50; *United States v. Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006).

The court must adequately explain its sentence, including "any deviation from the Guidelines range." *Cavera*, 550 F.3d at 190. While sentencing courts are "generally free to impose sentences outside the

recommended range," in doing so, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 189. As the Supreme Court has noted, "a major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

Assuming a sentence is procedurally sound, this Court then considers whether the sentence was substantively reasonable. In making that assessment, a reviewing court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. Accordingly, this Court will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id*. at 189. However, "[a]t the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it."

*Id.* at 191. Accordingly, district courts may not impose "whatever sentences suit their fancy." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008).

## B. Discussion

### 1. The district court committed procedural error in calculating Roglieri's Guidelines range.

#### a. The aggravating role adjustment U.S.S.G. § 3B1.1(c) does not apply.

As relevant here, the Sentencing Guidelines require a district court to impose a two-level adjustment if the defendant "was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The Sentencing Commission clarified that the "defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.*, cmt. 2. Factors a court must consider include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participating in planning or organizing the offense, the nature and scope

of the illegal activity, and the degree of control and authority exercised over others." *Id.*, cmt. 3.

The district court applied the adjustment based on the following considerations.[4] Stressing the amount of money Roglieri obtained from the offense, the district court found that he "did not receive simply a larger share but the lion's share of the fraud proceeds." A 201-02. In further support, the district court noted that Roglieri "founded Prime Capital," "signed the line of credit agreements with the victims, and the defendant was the individual who deposited funds in various bank accounts and conducted the wire transfers of funds." A 202. He also

---

[4] The Presentence Report scored the adjustment for the same reasons:

> Specifically, the defendant was founder, owner, and sole member of Prime Commercial Lending and therefore exercised management responsibility over the property, assets, or activities of the organization involved in the criminal activity (e.g. the defendant was signatory on LOCs on behalf of Prime Capital). Furthermore, the defendant employed, and paid, related defendants Kimberly Humphrey and Christopher Snyder. . . . [T]he defendant greatly profited from the offense as evidenced by the parties agreeing the property in the Forfeiture Allegations (e.g. exotic automobiles collectively valued at over $18,000,000 and luxury goods and art valued at over $5,000,000) was purchased with proceeds from the offense, as well as his purchase of luxury goods and private air travel late during the conspiracy, in December 2023.

PSR ⁋ 88.

purchased a house for Humphrey to use as a residence and office. A 202. Finally, the district court relied on an incident in which Roglieri cautioned Humphrey, "Get yourself under control now," after she warned him not to sign a loan obligation. A 202.

According to the district court, this demonstrated Roglieri's control over Humphrey. A 202. Based on these considerations, the district court held that "it is clear that the defendant was an organizer, leader, manager, or supervisor of this wire fraud conspiracy. Even if Humphrey was also an organizer, that does not negate the defendant's blatant control over the conspiracy and Humphrey." A 203-04.

None of these factors support the adjustment. While it is true, of course, that the largest share of the fruit of the offense went to Roglieri, no evidence established that Roglieri's enrichment was the result of any "claimed right." U.S.S.G. § 3B1.1, cmt. 4. Moreover, as the district court noted, Roglieri founded Prime Capital and engaged in acts in furtherance of the company's objectives, which included signing line of credit agreements, depositing funds in various bank accounts, and conducting

the wire transfers of funds. But none of these acts required Roglieri to exercise control over anyone.

The one instance relied upon by the district court – when Roglieri signed a loan agreement after Humphrey directed him not to – only serves to show that Humphrey had authority at least equal to Roglieri, otherwise she would not have felt emboldened to direct his activities. Indeed, as Roglieri pointed out below, Humphrey exercised considerable control. She "was more in charge of day-to-day operations, and responsible for attracting borrowers and nailing down agreements." PSR p. 42. In short, the evidence failed to demonstrate that Roglieri had control over either Humphrey or Snyder, the only other participants in the criminal activity.

**b. The district court erred by failing to apply the two-level zero-point offender reduction of U.S.S.G. § 4C1.1.**

The Sentencing Guidelines provide for a two-level downward adjustment when a defendant receives no criminal history points and satisfies several additional criteria. U.S.S.G. § 4C1.1(a). The district court held Roglieri was ineligible because (1) he received an adjustment

under § 3B1.1; and (2) he personally caused substantial financial hardship. A 204. As just discussed, the district court erred in applying the aggravated role adjustment of § 3B1.1. The district court also erred in finding Roglieri personally caused substantial financial hardship. Absent those erroneous findings, Roglieri is eligible for the two-level adjustment.

While Roglieri does not dispute that the victims suffered substantial financial hardship as a result of the offense, the district court did not find, and the record does not establish, that he *personally* caused any hardship.[5] The Sentencing Guidelines do not define the term "personally cause." Relying on the ordinary definition drawn from the dictionary and related cases, the only court that appears to have grappled with its meaning held that "personally cause" "refers to direct actions, taken without intervention of others or without any intervening steps." *United States v. Daramola*, 2024 WL 4241840 (D.N.M. Sept. 19, 2024).

[5] The district court noted that the PSR found that the offense caused substantial hardship. A 204; PSR ¶ 88. However, the PSR made no determination that Roglieri *personally* caused substantial hardship.

Roglieri was convicted of a conspiracy in which a company was used to commit wire fraud. As he noted below, others in the conspiracy, including Humphrey, were "more in charge of day-to-day operations, and responsible for attracting borrowers and nailing down agreements." PSR p. 42. While the Presentence Report summarizes the hardship suffered by four victims of the conspiracy, nothing in the record indicates that their hardship was "personally caused" by Roglieri, himself, as opposed to others in the conspiracy. Nor did anything in the record establish their hardship was caused without any intervening steps. Instead, in each case, clients wired ICA payments to a Prime Capital's company account pursuant to signed agreements. So, even if Roglieri was enriched as a result of the offense, the evidence failed to establish that he *personally* caused any victim's substantial financial hardship.

**c. The district court's guideline errors require remand for plenary resentencing.**

"Failure to calculate the correct Guidelines range constitutes procedural error." *Peugh v. United States*, 569 U.S. 530, 537 (2013). If this Court identifies procedural error in a sentence, "but the record indicates clearly that the district court would have imposed the same

sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Solis*, 18 F.4th 395, 401 (2013). Nothing in the record indicates that the district court would have imposed the same sentence absent the Guidelines errors. Therefore, this Court should remand for plenary resentencing.

**2. The district court imposed a substantively unreasonable sentence by relying on an erroneous assessment of Roglieri's conduct and sentencing him within a Guidelines range driven by a flawed loss enhancement that failed to account for his other mitigating evidence.**

Roglieri admitted to engaging in a conspiracy to commit wire fraud that resulted in more than $55 million in losses. While his conduct warranted a significant sentence, several considerations – ignored, misunderstood, or insufficiently considered by the district court – rendered the 97-month prison sentence unreasonable.[6]

[6] Although reviewed separately, review for substantive reasonableness is analytically linked to procedural considerations. Thus, in so far as any procedural challenge is more properly consider a substantive challenge, or vice versa, Roglieri asks this Court to review it as such.

**a. The district court based its sentence on a misunderstanding of Roglieri's offense and a failure to account for the considerable mitigating evidence reducing his culpability and the need for punishment.**

Roglieri's offense was based on promises to obtain funding for his clients' various projects. A 42. At sentencing, Roglieri demonstrated that he made good-faith efforts to obtain that funding. Beginning in 2021, Roglieri began seeking large scale investment funds. Eventually, he entered into agreements with two entities – Reign Financial and Berone Capital. As explained in Roglieri's sentencing memorandum, "Reign would execute trades or other investment activity through an account held in PCV's name at Berone Capital, a newer hedge fund registered with the Securities and Exchange Commission." A 125. As part of these agreements, Roglieri provided $20 million in October 2022, which he was led to believe would generate upwards of $500 million for Prime Capital to lend to its clients. A 130.

However, Roglieri never received the promised funding. Instead, Reign and Berone defrauded Roglieri. In contravention of their agreements, the third parties wired the $20 million provided by Roglieri

to an unrelated attorney, who then transferred it back to other accounts controlled by Reign and Berone. A 130-31. When the promised funding never materialized and Reign and Berone refused to return the money, Roglieri filed suit in February 2023. A 131. As Roglieri noted in his sentencing memorandum, "[t]he effect of this lawsuit, however, was only to firm up Berone's deception over the ensuing year." A 131. Reign and Berone provided false statements showing Roglieri's money safely in their accounts and falsely claimed through 2023 and into 2024 that they were still seeking ways to obtain the promised funding. A 131-37.

Lacking any other recourse, Roglieri continued to rely on these promises. He also continued to accept ICA payments from commercial loan clients as if Prime Capital had funding already lined up to follow through on lending agreements to provide hundreds of millions of dollars. As Roglieri noted below, "[t]his was not only bad business and wrong on his part, it was criminal." A 137. However, "[a]ccepting and soliciting money under false pretenses, but with the expectation that he would be able to access a large reservoir of capital to make things right and properly fund loans is a different animal than simply stealing other

people's money outright, and with no interest or ability in ever making good on your promises or funding agreements." A 137.

The district court utterly failed to appreciate the relevance of this information. Laboring under the impression that Roglieri sought a mere $20 million line of credit, the district court held that being defrauded out of $20 million "could not possibly have funded all of the loan agreements that the defendant made. And he knew that." A 231. Later, the district court remarked that "even if Berone and/or Reign had come through on that line of credit, this would still be a major fraud." A 232. Finally, the district court concluded, "I don't think Berone and Reign are an important part of your story, even assuming they failed to come through with that $20 million line of credit for you." A 232.

Had Roglieri simply invested $20 million poorly, the district court might have been right to discount the loss. The point, however, was much more significant. Roglieri's willingness to commit $20 million to obtain funding for the loan agreements meant that Prime Capital was not established for a fraudulent purpose, or there would have been no reason to relinquish $20 million. Roglieri set out to help his clients achieve

success. He wired the $20 million based on agreements promising Prime Capital upwards of $500 million, not to obtain a $20 million line of credit as the district court found. Contrary to the district court's conclusion, had Reign and Berone followed through on their promises, Prime Capital would have been able to meet its loan obligations. Though ignored by the district court, Roglieri failed to obtain this promised funding because he was defrauded. *See* SEC Litigation Release; *Security and Exchange Commission v. Reign Financial International, LLC, et al.*, No. 1:26-cv-23237, Dkt. No. 1 at 27-35 (S.D. Fla. May 7, 2026) (describing how Reign and Berone defrauded Roglieri (identified as Investor C) out of $20 million by promising a 300% monthly return and then concealing the fraud and lulling him for more than a year). And even if Roglieri was not defrauded out of $20 million, as the district court incorrectly suggested, the fact still remains that his genuine efforts to obtain funding failed through no fault of his own.

Further in this connection, the district court failed to appreciate that Roglieri's failure to obtain funding from Reign and Berone – whether or not as the result of his own victimization – explained why he continued

to accept (and spend) funds obtained from newer clients: he anticipated eventually being able to meet his obligations. That he failed to do so because Reign and Berone defrauded him and lulled him for more than a year further mitigates Roglieri's conduct. It explains how desperate Roglieri had become to keep Prime Capital afloat, believing, as a result of the lulling efforts of Reign and Berone, that their promised funding was always around the corner. Contrary to the district court's suggestion, then, Reign and Berone are "an important part of the story."

What is more, the district court failed to fully account for Roglieri's considerable history of charitable works. As noted below, Roglieri had a relatively modest upbringing, even living for a time in a shelter. So, when he began to find success in business, he looked for ways to give back. Multiple people provided letters describing Roglieri's generosity and charity work. A 149. He funded free turkey giveaways for over 2,000 families during the holidays, volunteered his time to work during a free Thanksgiving dinner, and provided meals for hospital staff during COVID.

Despite Roglieri's honest efforts to fund Prime Capital's loan obligations and his demonstrated history of charity, the district court could only view him as a "bottomless pit of greed." A 233. In light of Roglieri's generosity and sincere attempts to help his clients, this Court should find that the district court placed more emphasis on its caricaturized view of Roglieri's greed and culpability than the factor could bear. *See*, *e.g.*, *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) (remanding for resentencing after finding district court placed greater weight on need for rehabilitation than the factor could bear); *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (remanding for resentencing because sentence "almost three times the high end of the Guidelines range" for illegal reentry sentence was not supported by recidivism concerns). Ultimately, a sentence of 97 months in prison for Roglieri's fraudulent business failings and prodigality does not fall "within the range of permissible decisions." *United States v. Park*, 758 F.3d 193, 200 (2d Cir. 2014). This Court should remand for plenary resentencing.

**b. The district court failed to carefully treat the loss enhancement of U.S.S.G. § 2B1.1.**

Pursuant to the fraud guidelines, Roglieri's offense level was increased from seven to twenty-nine, a more than four-fold jump, due solely to a 22-level loss enhancement. Putting aside any other Guidelines provision, the loss enhancement had the effect of raising Roglieri's recommended sentence from a range of zero to six months' imprisonment to a range of 87 to 108 months' imprisonment.

At sentencing, Roglieri argued that the district court should impose a non-guideline sentence because the loss amount enhancement was not based on empirical evidence or national experience, failed to promote the purposes of sentencing, and failed to adequately measure culpability. More particularly, when Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-Guidelines period as a "starting point." 28 U.S.C. § 994(m). Because the original Commissioners could not agree on which purposes of sentencing would predominate, they purportedly based the guidelines on

an empirical study of time served for various offenses before the Guidelines. *See* U.S.S.G., Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

The Supreme Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

The fraud guideline is one example. It was not based on empirical data of past practice or on subsequent national experience. Before the Guidelines were adopted, first offenders sentenced for sophisticated fraud involving the highest loss amounts were sentenced, on average, to 18 to 24 months, and 18% of those defendants received probation. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing*

*Guidelines and Policy Statements* 33 (1987), http://www.src-project.org/wpcontent/pdfs/reports/USSC_Supplemtnary%20Report.pdf.

When the Sentencing Commission adopted the original Guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, *supra*, at 22-23. The Sentencing Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* U.S.S.G. § 2F1.1 (1987). The Sentencing Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., Ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) [hereinafter *Fifteen Year Report*] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement").

However, the Sentencing Commission's deterrence rationale was not based on empirical evidence. The empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Gupta*, 924 F. Supp. 2d 349 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506,

509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*

Roglieri drew the district court's attention to this history and to the fact that in fiscal year 2024, only 41 percent of the 5,000 defendants sentenced under § 2B1.1 received a within-Guidelines sentence. A 155-162; U.S. Sent'g Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, tb. 32, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table32.pdf.

As courts have noted, "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic

guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008). *See also United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (The "Guidelines were of no help."). "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

Moreover, the need to vary from the fraud guidelines is not limited to those instances in which the loss enhancement fails to adequately measure a defendant's intended loss. This Court recognized as much in *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). As explained in that case, the Sentencing Commission "valued fraud . . . at level six, which translates in criminal history category I to a sentence as low as

probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *Id*. This Court held that where, as here, "the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guideline sentence." *Id*.

Despite these well-documented flaws, the district court sentenced Roglieri within the Guidelines range. In doing so, however, the district court gave no indication that it considered the fraud Guidelines' various flaws. Nor did it explain why a sentence within those Guidelines was no greater than necessary to achieve the purposes of sentencing. Because the district court failed to appreciate the larger problems inherent in the loss amount enhancement – including its lack of empirical support and failure to comport with the purpose of sentencing – this Court should remand for resentencing.

The district court's Guidelines sentence might be justified had Roglieri intended the loss amount. However, Roglieri never intended to

permanently deprive his clients of their money. In holding otherwise, the district court misunderstood the nature of Roglieri's plan. Pursuant to agreements Prime Capital entered into with third parties, Roglieri transferred $20 million with the expectation that he would be able to access sufficient capital to fund Prime Capital's loan obligations. The district court assumed Roglieri was simply deprived of $20 million, which formed its conclusion that Roglieri intended to defraud his clients from the start. Accordingly, the loss enhancement was not an adequate measure of the intended harm. Because the district court failed to carefully treat the enhancement and placed greater weight on the loss amount than the factor could bear, this Court should vacate the judgment and remand for resentencing. *Cavera*, 550 F.3d at 191.

## II. The district court abused its discretion by including pre-offense expenses in the restitution order for V-9.

### A. Standard of Review

Restitution awards are reviewed for abuse of discretion. *United States v. Lucien*, 347 F.3d 45, 52 (2d Cir. 2003).

## B. Discussion

The Mandatory Victims Restitution Act (MVRA) requires restitution for offenses "committed by fraud or deceit" in which "an identifiable victim" has suffered "pecuniary loss." 18 U.S.C. § 3663A(c)(1). Restitution must be awarded "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). Calculation of that award "need not be mathematically precise." *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). However, a court must make a "reasonable estimate" of the loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

The district court abused its discretion by awarding restitution for project costs V-9 made independently of Prime Capital. V-9 planned to develop affordable housing. In an apparent attempt to determine the feasibility of that plan, V-9 engaged legal assistance and conducted site surveys and studies. Many of these expenses were incurred before V-9

entered into agreements with Prime Capital. A 263; PSR p. 44-46; V-9 spreadsheet.[7]

The district court held that "the money spent on legal fees, environmental tests, and property assessments *before* V-9 entered into a contract with Prime Capital is compensable." A 270 (emphasis added). According to the district court, "V-9 would not have taken out the loan or undertaken any of those expenses if it knew Defendant's conduct was fraudulent." A 270.

Of course, had V-9 been aware of Roglieri's fraudulent conduct, there are many things V-9 might not have done. But the MVRA only covers losses that were the "result of the fraud." *United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir.2007) (citing *United States v. Ebbers,* 458 F.3d 110, 128 (2d Cir.2006)). Nothing in the record established that the expenses incurred by V-9 prior to entering into a contract with Prime Capital were the result of any action taken by Prime Capital. Accordingly, any restitution award for V-9 should be limited to the losses

[7] The spreadsheet V-9 submitted in support of restitution was filed under seal in the district court and has been filed under seal in this Court.

associated with the payments it made to Prime Capital, which falls in line with the $5 million amount Roglieri consented to pay. A 264-65.

In concluding otherwise, the district court relied on this Court's decision in *United States v. Desnoyers*, 708 F.3d 378, 381 (2d Cir. 2013), which involved a defendant's improper monitoring of required air sampling during "rip and run" asbestos removal projects. The government sought to include costs associated with "pre-abatement" and "durings" sampling, even though there was no evidence that any of this work was done improperly. *Desnoyers*, 708 F.3d at 389. This Court agreed, concluding that the costs for both were "necessary to the overall scheme even though neither was integral to the offense of conviction." *Id*. at 390. But this was because "pre-abatement" and "durings" sampling are required under state law. *Id*. at 389. So, a person paying to remove asbestos from a given property must also pay for this additional sampling.

Unlike in *Desnoyers*, the expenses V-9 incurred in evaluating the site and preparing it for development had no necessary connection to Prime Capital. They were not legally required to do the work to secure

funding. Nor is there anything in the record indicating that the work was done at Prime Capital's direction. Instead, V-9, which developed its own plan, would have incurred those project costs even had it never been aware of Prime Capital. The project costs are wholly independent and severable from any action taken by Prime Capital. Therefore, this Court should vacate the amended judgment and remand for resentencing on V-9's restitution claims.

**Conclusion**

Based on the foregoing reasons, this Court should vacate the judgments of the district court and remand for resentencing.

August 10, 2026

Respectfully submitted,

*/s/*
James P. Egan
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

## Certificate of Compliance

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, counsel certifies that this brief complies with the type-volume limitations of Rule 32(a)(7), and contains 8,902 words, as counted by the word-processing system used to prepare this document.

*/s/*
James P. Egan
Assistant Federal Public Defender

## Certificate of Service

I, James P. Egan, certify that today, August 10, 2026, one copy of Appellant's Brief was served upon Rajit S. Dosanjh, Assistant United States Attorney, 100 South Clinton Street, Syracuse, New York 13261, by ACMS with mail delivery to follow.

*/s/*
James P. Egan