# 26-960(L)

*To be Argued by:* THOMAS R. SUTCLIFFE

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

**Docket Nos. 26-960 (L), 26-1289 (con)**

UNITED STATES OF AMERICA,
*Appellee,*

v.

KRIS ROGLIERI,
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE UNITED STATES OF AMERICA

TODD BLANCHE
*Attorney General*

JOHN A. SARCONE III
*First Assistant U.S. Attorney*
*Northern District of New York*
100 South Clinton Street
Syracuse, NY 13261-7198
315-448-0672
Thomas.Sutcliffe@usdoj.gov

JOSHUA R. ROSENTHAL
THOMAS R. SUTCLIFFE
*Assistant United States Attorneys*
*of Counsel*

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES PRESENTED ..... 1

STATEMENT OF THE CASE ..... 3

A. Introduction ..... 3

B. Procedural History ..... 3

STATEMENT OF FACTS ..... 4

A. Offense Conduct ..... 4

1. Roglieri's Business ..... 4

2. The Fraud ..... 6

a. Indigo Pharmaceuticals ..... 6

b. Onward Partners, LLC ..... 7

c. 1322 Developments, LLC ..... 8

d. 1800 Park Avenue, LLC ..... 8

3. Roglieri's Violent Threats ..... 10

B. PSR ..... 11

C. Sentencing Submissions ..... 12

D. Sentencing Hearing ..... 15

SUMMARY OF ARGUMENT ..... 24

ARGUMENT ..... 26

POINT I:
Roglieri's Sentence Is Procedurally Reasonable. .... 26

A. Governing Law .... 26

1. Procedural Reasonableness Generally .... 26

2. U.S.S.G. § 3B1.1 .... 27

3. U.S.S.G. § 4C1.1 .... 28

B. Standard of Review .... 29

C. Discussion .... 30

1. The district court correctly applied a two-level enhancement under U.S.S.G. § 3B1.1(c). .... 30

2. Roglieri was ineligible for a reduction under U.S.S.G. § 4C1.1. .... 34

a. U.S.S.G. § 4C1.1(a)(10) .... 34

b. U.S.S.G. § 4C1.1(a)(6) .... 35

3. The district court properly discounted Roglieri's reliance on the Reign and Berone fraud. .... 41

POINT II:
Roglieri's Sentence Is Substantively Reasonable. .... 45

A. Governing Law and Standard of Review ..... 45

B. Discussion ..... 47

POINT III:
The District Court Did Not Abuse Its Discretion in Awarding V-9 Restitution. ..... 53

A. Relevant Facts ..... 53

B. Governing Law ..... 57

C. Standard of Review ..... 58

D. Discussion ..... 59

1. V-9's pre-contract project expenses ..... 59

2. V-9's other losses ..... 62

CONCLUSION ..... 65

## TABLE OF AUTHORITIES

**Cases:**

*United States v. Albarran*,
943 F.3d 106 (2d Cir. 2019) ............................ 46

*United States v. Algahaim*,
842 F.3d 796 (2d Cir. 2016) ...................... 50, 51

*United States v. Aumais*,
656 F.3d 147 (2d Cir. 2011) ............................ 58

*United States v. Barrett*,
102 F.4th 60 (2d Cir. 2024),
*cert. granted in part*, 145 S. Ct. 1307,
*and rev'd in part*, 607 U.S. 128,
*and opinion withdrawn in part*,
172 F.4th 210 (2d Cir. 2026) ........................... 30

*United States v. Bastian*,
770 F.3d 212 (2d Cir. 2014) ............................ 39

*United States v. Bleau*,
930 F.3d 35 (2d Cir. 2019) .............................. 52

*United States v. Boccagna*,
450 F.3d 107 (2d Cir. 2006) ............................ 61

*United States v. Bonilla*,
618 F.3d 102 (2d Cir. 2010) ............................ 48

*United States v. Botti*,
711 F.3d 299 (2d Cir. 2013) ............................ 62

*United States v. Brunson*,
482 F. App'x 811 (4th Cir. 2012)...................... 49

*United States v. Connearney*,
No. 25-15, 2026 WL 1506585
(2d Cir. May 28, 2026) ........................................ 35

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) ............................... 50

*United States v. Daramola*,
No. 20-CR-2124, 2024 WL 4241840
(D.N.M. Sept. 19, 2024) ..................................... 39

*United States v. Darrah*,
132 F.4th 643 (2d Cir. 2025) ...................... 30, 43

*United States v. DeRiggi*,
72 F.3d 7 (2d Cir. 1995) ..................................... 30

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994) ................................... 31

*United States v. Escobosa*,
791 F. App'x 214 (2d Cir. 2019) ......................... 43

*United States v. Felder*,
993 F.3d 57 (2d Cir. 2021) ................................. 38

*United States v. Frady*,
456 U.S. 152 (1982) ........................................... 29

*United States v. Goodrich*,
12 F.4th 219 (2d Cir. 2021) ........................ 57, 58

*United States v. Griswold*,
No. 23-7806-CR, 2024 WL 4601448
(2d Cir. Oct. 29, 2024) ...................................... 48

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) .............................. 58

*United States v. Huerta*,
371 F.3d 88 (2d Cir. 2004) ......................... 31, 32

*United States v. Irwin*,
No. 24-10791, 2025 WL 2887995
(5th Cir. Oct. 10, 2025)............................... 36, 37

*United States v. Jesurum*,
819 F.3d 667 (2d Cir. 2016) ....................... 26, 41

*United States v. Lawrence*,
139 F.4th 115 (2d Cir. 2025)............................ 48

*United States v. Moore*,
975 F.3d 84 (2d Cir. 2020) ............................... 43

*United States v. Moose*,
893 F.3d 951 (7th Cir. 2018)...................... 49, 51

*United States v. Muzio*,
966 F.3d 61 (2d Cir. 2020) ......................... 46, 47

*United States v. Okunola*,
No. 25-1074, 2026 WL 37683
(6th Cir. Jan. 6, 2026) ...................................... 49

*United States v. Osuba*,
67 F.4th 56 (2d Cir. 2023)................................ 29

*United States v. Parks*,
179 F.4th 144 (2d Cir. 2026)...................... 37, 38

*United States v. Pescatore*,
637 F.3d 128 (2d Cir. 2011) .............................. 57

*United States v. Pristell*,
941 F.3d 44 (2d Cir. 2019) ........................ 28, 31

*United States v. Rainford*,
110 F.4th 455 (2d Cir. 2024) ..................... 38, 58

*United States v. Rivernider*,
828 F.3d 91 (2d Cir. 2016) .............................. 58

*United States v. Rosa*,
957 F.3d 113 (2d Cir. 2020) ............................ 48

*United States v. Salim*,
690 F.3d 115 (2d Cir. 2012),
*superseded on other grounds by* the CARES Act, Pub. L. No. 116-136,
§ 15002(b), 134 Stat. 281 (2020) ..................... 48

*United States v. Sow*, --- F.4th ---,
25-2621-CR, 2026 WL 3316039
(2d Cir. Nov. 3, 2026) ...................................... 27

*United States v. Spoor*,
904 F.3d 141 (2d Cir. 2018) ............................ 46

*United States v. Thomas*,
628 F.3d 64 (2d Cir. 2010) .............................. 48

*United States v. Verkhoglyad*,
516 F.3d 122 (2d Cir. 2008) .......... 29, 41, 45, 46

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) ............................ 29

*United States v. Vinales*,
78 F.4th 550 (2d Cir. 2023) ............................. 29

*United States v. Wisniewski*,
121 F.3d 54 (2d Cir. 1997) ........................ 31, 34

*United States v. Wynn*,
108 F.4th 73 (2d Cir. 2024) ........................ 40, 46

**Federal Statutes, Rules and Other Authorities:**

18 U.S.C. § 1343 .............................................. 3, 46

18 U.S.C. § 1349 .............................................. 3, 46

18 U.S.C. § 3553(a) ................................ 23, 26, 48

18 U.S.C. § 3553(a)(2)(A) .................................... 49

18 U.S.C. § 3663A(a)(1) ...................................... 57

18 U.S.C. § 3663A(a)(2) ...................................... 37

18 U.S.C. § 3663A(c)(1)(A)(ii) .............................. 57

18 U.S.C. § 3663A(c)(1)(B) .................................. 57

18 U.S.C. § 3664(e) ............................................ 58

U.S.S.G. § 1B1.3(a)(1) ........................................ 37

U.S.S.G. § 1B1.3(a)(1)(A) .................................... 37

U.S.S.G. § 1B1.3(a)(1)(B) .................................... 37

U.S.S.G. § 1B1.3 cmt. n.3(D) .............................. 37

U.S.S.G. § 2B1.1 ..........................................passim

U.S.S.G. § 2B1.1(a)(1) ........................................ 11

U.S.S.G. § 2B1.1(b) ........................................ 14, 25

U.S.S.G. § 2B1.1(b)(1)(L) ..................................... 11

U.S.S.G. § 2B1.1(b)(2) .......................................... 37

U.S.S.G. § 2B1.1(b)(2)(A) ..................................... 11

U.S.S.G. § 2X1.1(a) ............................................. 11

U.S.S.G. § 3B1.1 ..........................................passim

U.S.S.G. § 3B1.1(a) ........................................ 27, 31

U.S.S.G. § 3B1.1(b) ........................................ 27, 32

U.S.S.G. § 3B1.1(c) .......................................passim

U.S.S.G. § 3B1.1 cmt. n.4 .................. 28, 31, 32, 33

U.S.S.G. § 4C1.1 ..........................................passim

U.S.S.G. § 4C1.1(a)(6) ..................................passim

U.S.S.G. § 4C1.1(a)(10) .................................. 28, 34

U.S.S.G. § 4C1.1(b)(3) .......................................... 38

**Miscellaneous:**

25 Williston on Contracts § 66:100
(4th ed. 2026) .................................................... 60

Restatement (Second) of Contracts § 351,
cmt. (e) (1981) .................................................... 60

Stephen Breyer,
*Federal Sentencing Guidelines Revisited*,
11 Fed. Sentencing Reporter 180 (1999) ......... 60

# United States Court of Appeals
**FOR THE SECOND CIRCUIT**
**Docket Nos. 26-960 (L), 26-1289 (con)**

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

KRIS ROGLIERI,
*Defendant-Appellant.*

---

**BRIEF FOR THE UNITED STATES OF AMERICA**

---

## STATEMENT OF THE ISSUES PRESENTED

1. The defendant defrauded multiple victims of over $55,000,000 by promising to finance property development projects with loans he knew he could not fund and stealing the money his clients paid him to obtain that financing. Did the district court:

(a) commit procedural error by applying a two-level leadership enhancement where the defendant was the CEO and founder of the companies through which the fraud was conducted; decided what contracts those companies entered; controlled the companies' finances; and reaped a profit several times larger than what his co-conspirators received;

(b) commit procedural error by denying the defendant a two-level "zero-point offender" reduction that he was disqualified from receiving both because of the role-in-the-offense enhancement and because of the substantial harm he personally caused his victims; and

(c) commit plain procedural error by discounting one of the defendant's mitigation arguments where, even assuming the court made an isolated factual error, it provided independent grounds for its conclusion that rendered any error harmless.

2. The district court imposed a 97-month term of imprisonment. That sentence was at the bottom of a guidelines range reflecting policy choices with which the court was permitted to agree. And numerous aggravating factors supported the sentence, including the scale of the defendant's fraud, the harm his victims suffered, and his threats against law enforcement. Was the sentence substantively reasonable?

3. Roglieri's fraud caused one victim's development project to fail, leaving it liable for expenses it could no longer recoup. Did the district court abuse its discretion by awarding restitution for those expenses?

## STATEMENT OF THE CASE

### A. Introduction

Defendant-Appellant Kris Roglieri appeals the judgment of conviction the United States District Court for the Northern District of New York (D'Agostino, J.) entered following his plea of guilty to conspiring to commit wire fraud. He argues that his term of imprisonment is procedurally and substantively unreasonable and challenges the amount of restitution awarded to one of his victims.

### B. Procedural History

On November 13, 2025, Roglieri pleaded guilty, pursuant to a plea agreement, to one count of conspiring to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343. A:35-98.[1] On April 3, 2026, the district court imposed a 97-month term of imprisonment and three-year term of supervised release. A:243. It also awarded restitution to eight victims as stipulated by the parties, while reserving decision on the appropriate award for a ninth victim ("V-9"). A:249-50. Judgment entered on April 6, 2026, A:254-60, and Roglieri filed a timely notice of appeal on April 13, 2026, A:261. That appeal was assigned case no. 26-960.

---

[1] "A:" refers to Roglieri's appendix. "GA" refers to the appendix the government has moved to file under seal. "PSR" refers to the presentence investigation report lodged on March 17, 2026.

The parties filed letters addressing the restitution owed to V-9. A:262-65. On April 27, 2026, the district court issued an order awarding V-9 $9,800,326. A:266-71. The court issued an amended judgment on May 5, 2026. A:272-79. Roglieri filed a timely notice of appeal the next day. A:280. That appeal was assigned case no. 26-1289. This Court later consolidated both appeals.

According to a Bureau of Prisons website, Roglieri's projected release date is February 9, 2031.

## STATEMENT OF FACTS

### A. Offense Conduct

#### 1. Roglieri's Business

In December 2021, Roglieri and Kimberly Humphrey (n/k/a Kimberly Owen) founded Prime Capital Ventures, LLC ("Prime Capital"). PSR ¶¶ 41-42. Roglieri was the CEO and sole member. PSR ¶ 41. Humphrey was the Executive Vice President. *Id.* And Humphrey's brother, Christopher Snyder, was a Prime Capital employee.[2] *Id.* Roglieri also was the CEO and sole

[2] Humphrey and Snyder were charged in separate proceedings and pleaded guilty. *See* case no. 1:25-cr-00238 (N.D.N.Y.) (Humphrey); case no. 1:25-cr-00195 (N.D.N.Y.) (Snyder).

member of an affiliate company, Prime Commercial Lending, LLC ("Prime Commercial").

Prime Capital and Prime Commercial held themselves out as companies able to make large commercial loans through funding agreements with third-party hedge funds. PSR ¶ 42. Around May 2022, for example, Prime Commercial posted a video online stating that it had provided $188,000,000 in funding for the construction of a hotel in Atlanta, Georgia. PSR ¶ 15.

The process Prime Capital described to prospective borrowers worked as follows. First, the borrower signed a letter of intent with Prime Capital stating the key terms of the loan. PSR ¶ 43. The borrower then was required to pay $25,000 to $75,000 "for due diligence that Prime Capital claimed to perform while it assessed the borrower's project and purportedly secured financing for that project." *Id.* If, afterwards, the prospective borrower still wished to proceed, it signed a line of credit agreement with Prime Capital in which Prime Capital "promis[ed] to start funding the borrower's loan within a specified timeframe, typically about four months." PSR ¶ 44. The borrower also paid Prime Capital an upfront Interest Credit Account Payment ("ICA Payment"). PSR ¶¶ 44-45. Those payments could be as large as $20,000,000. PSR ¶ 45.

Roglieri told prospective borrowers that ICA Payments served as collateral for the loan and a pre-paid interest fund that Prime Capital could

draw against as interest came due. PSR ¶ 47. He assured borrowers that the ICA Payments would be placed in a "pledged account" and that borrowers would receive regular statements reflecting drawdowns. *Id.* He also promised borrowers that Prime Capital would refund the ICA Payment in the event it could not secure financing. PSR ¶ 45. As Roglieri told one client in December 2023, "[t]here really isn't any risk." PSR ¶ 47.

#### 2. The Fraud

While making these representations, Roglieri knew neither Prime Capital nor Prime Commercial had ever made any commercial loans, including the hotel project described in the May 2022 video, and they had no independent ability to do so. PSR ¶¶ 15, 42. Still, Prime Capital entered into agreements with borrowers promising to provide millions of dollars in funding that Roglieri knew the company could not provide. PSR ¶ 42. Also, rather than placing borrowers' ICA Payments into pledged accounts as promised, Roglieri transferred the money between clients and used it to pay personal expenses. PSR ¶¶ 47, 49. Below are several examples:

##### a. Indigo Pharmaceuticals

In June 2022, Prime Capital accepted an ICA Payment of $1,000,000 from a company called Indigo Pharmaceuticals ("Indigo") in anticipation of Prime Capital loaning Indigo $20,000,000. PSR

¶ 48. Prime Capital had no ability to fund that amount. *Id.* Indeed, on July 8, 2022, Humprey emailed Roglieri, saying: "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." *Id.* Roglieri replied: "Get yourself under control. NOW." *Id.* Roglieri later signed agreements on behalf of Prime Capital agreeing to loan Indigo $20,000,000. *Id.*

**b. Onward Partners, LLC**

On September 7, 2022, Roglieri, on behalf of Prime Capital, signed an agreement with Onward Partners, LLC ("Onward"). PSR ¶ 50. Prime Capital agreed to loan Onward up to $107,000,000. *Id.* Later that month, Onward sent Prime Capital an ICA Payment of $20,000,000. PSR ¶ 51. Prime Capital's agreement with Onward specified that the payment was to be kept in a designated account and used only to make interest payments on the anticipated loan. PSR ¶ 50. Roglieri, however, wired about $3,200,000 of Onward's ICA Payment to Indigo to partially fund the loan Prime Capital had previously promised. PSR ¶ 51. He then used the remainder of the payment to secure a line of credit for Prime Capital. *Id.* Roglieri later partially replenished Onward's ICA account with ICA Payments from newer clients. *Id.*

**c. 1322 Developments, LLC**

In August 2023, Roglieri, on behalf of Prime Capital, signed an agreement with a company called 1322 Developments, LLC ("1322 Developments") promising to loan it up to $46,350,000. PSR ¶ 59. The following month, 1322 Developments made an ICA Payment of $14,249,832, which Prime Capital was contractually obliged to keep in a "locked pledged account" and use only to secure capital for the loan, make interest payments, or provide a refund if necessary. PSR ¶ 59-60 (quoting contract). Roglieri and Humphrey used $7,000,000 of that payment to fund at least four unrelated projects. PSR ¶ 60. Roglieri pledged the remaining amount to a bank to obtain a line of credit for Prime Capital, which he quickly exhausted. *Id.* Prime Capital never loaned any funds to 1322 Developments and never refunded any of the ICA Payment. *Id.*

**d. 1800 Park Avenue, LLC**

In December 2023, 1800 Park Avenue, LLC ("1800 Park") made a $5,000,000 ICA Payment to Prime Capital. PSR ¶ 61. Roglieri, Humphrey, and Snyder solicited that payment despite knowing that several of Prime Capital's creditors had initiated an involuntary bankruptcy proceeding against it the same month. *Id.* Roglieri made a "contractual promise" to 1800 Park that it would keep that payment in a "separate and distinct account" and would refund the payment if

the parties did not enter into an approximately $100,000,000 loan agreement. *Id.* (quoting contract in second set of quotation marks). Nonetheless, Roglieri used $950,000 of 1800 Park's ICA Payment to partially fund a loan for a different client. PSR ¶ 63. He transferred an additional $2,000,000 "to a credit union account held by a Virginia company owned by an associate of Humphrey" who "then used some of these funds to wire money to Snyder for Humphrey's benefit, and to make at least $130,000 in payments to third parties for Humphrey's benefit." *Id.* Roglieri paid a further "$101,000 for round-trip private air travel between Albany International Airport and Anguilla for a family vacation." *Id.* And he bought an $84,000 Rolex watch. *Id.*

***

"[M]ore than a dozen victim borrowers paid Prime Capital and Prime Commercial due diligence fees and ICA payments exceeding $50,000,000 based on false representations about Prime Capital's ability to secure funding and false promises that ICA Payments would be refundable within a specified timeframe." PSR ¶ 64. Roglieri personally received $55,484,674.84 in fraudulent proceeds, PSR ¶ 65, which he used to purchase the private air travel and Rolex watch described above, as well as 12 luxury cars, numerous additional luxury watches, and an approximately $3,800,000 house in Virginia Beach for Humphrey's use, PSR ¶¶ 30, 54. Meanwhile, Roglieri's victims went bankrupt, lost retirement savings, were forced to

let go employees, experienced severe emotional distress, or suffered related harms. *See* PSR ¶ 86; *see generally* PSR pgs. 44-186.

### 3. Roglieri's Violent Threats

In February 2024, a few months before charges were filed, "Person-1" reported to law enforcement that s/he had a telephone conversation with Roglieri the previous January, during which he "said he would 'take out' the receiver and judge who were involved in his bankruptcy proceeding." PSR ¶ 76 (quoting Person-1). Roglieri also sent Person-1 text messages saying "I'm fucking gonna wack anybody that comes after me"; "Fair game"; "You wanna come after me with guns you gonna get the same"; "I feel myself getting angry and vengeance to those that are doing this"; "Including the attories, judge, receiver etc"; "I don't really play by the rules"; "Never have and never will"; "And that's dangerous as I feel myself getting to that point with all involved against me."[3] *Id.* (quoting text messages). In May 2024, Roglieri told Person-1 that he was in a "dark place"; knew the three FBI agents who were investigating him; knew the home address of one of the agents; and would "put a bullet in [that agent's] head." PSR ¶ 77 (brackets in original) (quoting Person-1). Roglieri also said that "when someone takes everything away from you… if I go down, everyone goes down" and that "I ain't going out like that." *Id.* (quoting Roglieri).

---

[3] Typos and misspellings in the quoted text messages are as they appear in the original.

In February 2024, investigators discovered numerous firearms at one of Roglieri's properties, including an AR-15 style rifle. PSR ¶ 75.

## B. PSR

Probation determined that Roglieri's base offense level was 7 pursuant to U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1). PSR ¶ 84. It then applied two specific offense characteristics to which the parties had stipulated in the plea agreement. A:48. The first a was 22-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(L) because the actual loss Roglieri inflicted was more than $55,000,000 but less than $65,000,000. PSR ¶ 85. The second was a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved 10 or more victims and "resulted in substantial financial hardship to one or more victims."[4] PSR ¶ 86.

Probation next applied a two-level upward adjustment pursuant to U.S.S.G. § 3B1.1(c) based on its determination that Roglieri "was an organizer, leader, manager, or supervisor." PSR ¶ 88. It explained that Roglieri "was founder, owner, and sole member of Prime Commercial Lending and therefore exercised management responsibility over the property, assets, or activities of the organization involved in the criminal activity," including signing lending

[4] Roglieri had stipulated in his plea agreement that the offense involved 10 or more victims, but not that it caused substantial harm. A:48.

agreements on behalf of the company. *Id.* It also observed that Roglieri "employed[] and paid" Humphrey and Snyder. *Id.* And it noted that Roglieri "greatly profited from the offense," as evidenced by the luxury goods and services he purchased. *Id.*

After accounting for acceptance of responsibility, Probation determined that Roglieri's total offense level was 30. PSR ¶ 94. It also determined that his criminal history category was I. PSR ¶ 102. Accordingly, Roglieri's guidelines imprisonment range was 97 to 121 months. PSR ¶ 124. Probation did not identify any factors warranting a variance. PSR ¶ 139.

Roglieri submitted to Probation objections disputing, among other things, the Section 3B1.1(c) adjustment. PSR pgs. 41-42. The government argued the adjustment was appropriate. PSR pg. 43. Probation declined to revise its calculation. *Id.*

**C. Sentencing Submissions**

In its sentencing memorandum, the government requested a sentence at the high end of the applicable guidelines ranges. A:100. It highlighted the total losses Roglieri inflicted, the number of victims, the harm those victims suffered, and the need for general deterrence. A:103-07.

In his sentencing memorandum, Roglieri claimed that when he started Prime Capital, he intended for it to succeed as a legitimate business. A:120-21. But he stated that the business failed when he himself was the victim of fraud. *Id.* According to Roglieri, in September and October 2022, he entered into agreements with a company called Reign Financial ("Reign"). A:125-26, 128. Reign promised to "execute trades or other investment activity" using Prime Capital money kept in "an account held in [Prime Capital's] name at" a hedge fund called Berone Capital Partners ("Berone"). A:125. Roglieri expected the "trades" and "investment activity" to "generate upwards of $500 million through the year, which Prime [Capital] could then lend out to borrowers." A:130. On October 24, 2022, Roglieri transferred $20,000,000 to Reign and/or Berone, which was derived from client ICA Payments. A:125-26; PSR ¶ 52. Reign and Berone misappropriated the payment. A:130-133. And Roglieri lost the $20,000,000. A:133. But he claimed he was "was strung along for an entire year with one false promise after another involving different strategies and investment models." A:136. Thus, while Roglieri admitted that he continued to accept ICA Payments and due diligence fees during this period knowing he had no source of funding, he did so with the belief that he would eventually "be able to access a large reservoir of capital and to make things right and properly fund loans." A:136-37. Roglieri attached exhibits that he claimed documented Reign's and Berone's alleged fraud. *See generally* A:122-40.

Roglieri also cited his success as a commercial lender before he founded Prime Capital, A:140; claimed he was "not a part of the primary negotiations" with 1800 Park (one of the defrauded clients discussed *supra* in Section A.2), A:141; and downplayed the significance of his luxury spending, A:144-47. Roglieri also cited mitigating factors, including his modest upbringing, family, charitable contributions, and activities while in custody. A:147-53.

Roglieri again disputed the applicability of the Section 3B1.1(c) enhancement. A:122. He further claimed that without it, he would be eligible for a "zero-point offender" adjustment under U.S.S.G. § 4C1.1, thus reducing his imprisonment range to 63 to 78 months. A:122.[5] He asked the district court to sentence him "to a term between 4 and 6 years, generally in line with the Guidelines under that lowered range." *Id.* He cited sentences imposed in other cases and nationwide sentencing statistics. A:153-54, 162-63. And he argued that the guidelines range was excessive because Section 2B1.1(b) placed an inordinate emphasis on loss amount. A:155-62.

Both parties submitted letters responding to the other's memorandum. A:165-77, 180-83.

---

[5] In his memorandum, Roglieri initially calculated the range to be 51 to 63 months, *id.*, but he corrected the range in a subsequent filing, A:165.

Among other things, the government again argued that Section 3B1.1(c) applied and argued that, even if it did not, Roglieri still did not qualify for a Section 4C1.1 reduction because he "personally caused substantial financial hardship." A:180-82 (quoting U.S.S.G. § 4C1.1(a)(6)) (brackets omitted). Roglieri also submitted a letter updating the district court on a meeting he had with counsel for the bankruptcy trustee and the status of a pending state criminal charge. A:178-79.

### D. Sentencing Hearing

During the sentencing hearing, the district court asked defense counsel whether he had any objections to the PSR beyond those previously provided. A:192. Counsel reiterated his objection to the U.S.S.G. § 3B1.1 adjustment. *Id.* He also asked the district court to strike the paragraphs in the PSR describing his violent threats in January and May 2024, arguing that the January remarks were a "tongue-in-cheek" reference to a movie he had just watched, and the May remarks were inaccurately recounted by an unreliable witness. A:193-95.

The district court confirmed that it had reviewed all pertinent materials and considered the applicable statutory provisions. A:197. It next addressed Roglieri's objections to the PSR. *Id.* Among other things, the court rejected his request to strike the portions referencing his violent remarks. A:198-200. It dismissed as "specious" defense counsel's attempt to characterize the

January 2024 threats as simply a movie reference. A:199. The court explained that Roglieri "used the words that he used because that's who he is," noting for example, the firearms found in his home. *Id.* The court also determined that Person-1's account of the May 2024 conversation was credible given that it "fit[] with many of the words and many of the things that [Roglieri] did once he realized that the FBI was on to his scheme." *Id.*

The district court next determined that the Section 3B1.1(c) enhancement was appropriate. A:200-04. It gave several reasons. First, Roglieri received "a larger share of fraud proceeds." A:201. Specifically, he received $55,484,674.84 in fraud proceeds, whereas Humphrey and Snyder received about $382,500 and $615,500, respectively. A:201-02 (citing PSR ¶¶ 65-67). Roglieri thus "did not receive simply a larger share but the lion's share of the fraud proceeds." A:202. Roglieri also "founded Prime Capital," "signed the line of credit agreements with the victims," "deposited funds in various bank accounts," "conducted the wire transfers of funds," and "used approximately $3,800,000 in due diligence [and] ICA funds to buy" the Virgina Beach house Humphrey used as a residence. *Id.* He likewise "controlled Humphrey's conduct," such as when he told her to "[g]et [her]self under control" after she objected to the Indigo deal in July 2022. A:202 (quoting PSR ¶ 48). The court cited case law stating that a defendant qualifies for a Section 3B1.1(c) adjustment if he controls just one other member of the conspiracy. A:203. And it explained that

Roglieri still qualified for the enhancement even if Humphrey was herself an organizer, citing Application Note 4. A:203-04.

The district court next explained that Section 3B1.1(c)'s applicability rendered Roglieri ineligible for a reduction under Section 4C1.1. A:204. But it also determined that, even if Section 3B1.1(c) did not apply, Roglieri still would be ineligible for a reduction "because he personally caused substantial hardship, pursuant to guideline 4C1.1[(a)(6)]." *Id.* It noted Roglieri's lack of objection to that conclusion and cited the PSR's uncontested description of the financial hardship multiple victims had suffered. *Id.*

Both parties made sentencing arguments consistent with their written submissions. A:204-18. They also confirmed that they had agreed on the amount of restitution for eight of the victims, but not V-9. A:218-220. The court gave the parties two weeks to submit briefing on the amount V-9 was owed.[6] A:221. Roglieri then spoke on his own behalf. A:222-25.

The district court proceeded to impose sentence. It first reiterated that it had thoroughly reviewed all the pertinent documents in the case. A:225-26. It next explained that it believed that "a person's true colors . . . are often seen when we look at words and conduct when someone believes they're not

[6] The facts relating to V-9's restitution and the parties' arguments are discussed *infra* in Point III.

being watched." A:226. And it recited some of Roglieri's January 2024 text messages, which it characterized as "despicable." A:227. While the court did not "add[] any time to [Roglieri's] sentence" based on those remarks, it found them "indicative of [his] history and characteristics." A:228.

The district court then stated:

> I do disagree with the premise that had Mr. Roglieri not been stiffed, to paraphrase what he is maintaining, by Reign and Berone, that perhaps his fraud may not have occurred or perhaps the fraud may have been a lesser fraud.
>
> It's very clear to me from reading the PSIR and the sentencing memo submitted on behalf of the defense that, to paraphrase what you said, [defense counsel], the failure of Berone and Reign to come through with a $20 million line of credit for Mr. Roglieri is an important part of the story.
>
> I'm not so sure it's an important part of the story and I'm going to tell you why.

A:228-29.

First, the district court recounted Roglieri's promises to clients that the ICA Payments would remain in "pledged account[s]," clients would receive monthly or quarterly statements, and that,

accordingly, there "really [was not] any risk." A:229-30 (quoting PSR). The court called those representations "nonsense." A:230. It explained that the ICA Payments never went into pledged accounts and the borrowers never received statements. *Id.* Prime Capital "was set up at the get-go to defraud." *Id.*

The district court continued:

> What [Roglieri] didn't [tell clients] was that he was going to be using the ICA monies to purchase a 2003 Ferrari Enzo, 2014 Ferrari LaFerrari. I have never even heard of some of these cars. A 2022 Mercedes-Benz, a 1982 Mercedes-Benz, a 1989 Mercedes-Benz, a 2007 Mercedes-Benz, a 1987 different Mercedes-Benz, a 2004 Porsche Carrera, a 2022 Ferrari Competizione, a 2020 Mercedes-Benz, a 2007 Maserati, a 2023 Mercedes-Benz, a Ferrari Engine Table, a Richard Mille watch, another Richard Mille watch, at least six Rolex watches, and the house that he bought in Virginia Beach.
>
> I mean, this is why I say this corporation, I mean, this entity was set up to defraud people. There was never any intention that that ICA money was going to be put into a pledged account. If it wasn't being used to buy these ridiculous commodities, it was being used to fund other loans.

And although I'm being asked to believe that Mr. Roglieri's troubles began when Reign and Berone failed to come through with a $20 million loan to him, neither Berone nor Reign were indicted as part of this case. That doesn't mean that they may not be indicted. I just don't know. But I have no proof other than what defense counsel has presented to me and what it learned in the civil -- and what I learned in the civil action [*see* PSR ¶ 71] as to whether Berone or Reign in fact defrauded the defendant.

However, even if that's true, even if I accept that as true, that the defendant was defrauded out of $20 million, that money could not possibly have funded all of the loan agreements that the defendant made. And he knew that.

For example, as stated in paragraph 59 of the final PSIR, the defendant signed a line of credit agreement with a victim in which the defendant agreed to loan -- a loan of up to $46,350,000. That was a single loan agreement.

Any purported fraud by Berone or Reign certainly does not negate the defendant's own fraud for which he is being sentenced today. And again, I truly believe that even if Berone and/or Reign had come through on that line of credit, this would still be a major fraud.

> In fact, you were boasting about being able to fund multi-million-dollar projects even before you got involved with Berone and Reign.
>
> In 2021, out on YouTube you put a statement that Prime Capital Lending through its fund, Prime Capital Ventures, is proud to announce $188 million funding of a hotel in Atlanta, Georgia. You advertise that even though you knew full well that neither Prime Commercial Lending [n]or Prime Capital Ventures had obtained any funding whatsoever.
>
> I don't think Berone and Reign are an important part of your story, even assuming they failed to come through with that $20 million line of credit for you.
>
> Even when your co-conspirator was telling you not to sign another loan in light of everything collapsing before you, you told her to get a hold of herself and you went ahead and you signed an agreement for another loan that you knew you could never honor.

A:230-33.

The district court went on to explain that it disbelieved defense counsel's claim that Roglieri was a "successful businessman" before Prime

Capital, noting, for example, tax liens and a civil judgment that had previously issued against him and his past failure to file income taxes. A:233. It reiterated that it thought Roglieri's "business model ha[d] been off from day one." *Id.* And it told Roglieri that "I believe, from everything that I reviewed in this case, that you are basically the face of a bottomless pit of greed." *Id.* The court also observed that "[m]any of the people that [Roglieri] swindled are never going to be made whole." *Id.*

The district court cited cases from this Court upholding sentences ranging from 78 to 140 months for comparable offenses. A:234-35. It therefore determined that a guidelines sentence for Roglieri would not result in a "sentencing disparity." A:235. The court also determined that it was permitted to consider Roglieri's "lifestyle" and luxury purchases as evidence of his greed, citing case law in support. A:235-39. It reiterated its view that Roglieri "knew he did not have the funds to engage in the contracts that he signed and that he used what funds he did have selfishly and for purely personal gain." A:239. And it summarized the contents of several victim impact statements, contrasting the suffering of Roglieri's victims with his purchase of Rolex watches, private jet travel, and a multi-million-dollar house. A:239-41. The court also noted mitigating factors, including Roglieri's lack of criminal history and "past generosity and other acts of kindness." A:241.

The district court determined that the guidelines imprisonment range was 97 to 121 months. A:242. It then explained:

> In imposing sentence, I have considered all of the factors I have reviewed here today, including the nature and circumstances of the offense, which involved over $55 million in wire fraud, over ten victims, some of whom suffered substantial financial hardship. I've considered the defendant playing an aggravating role. . . .
>
> I have considered the history and characteristics of the defendant, including his family ties and responsibilities, his mental and emotional condition. The instant offense represents the defendant's first criminal conviction. The Court finds the sentence that I will impose will be sufficient but not greater than necessary to meet the goals of sentencing outlined in 18 United States Code, Section 3553(a).

A:242. The court imposed a 97-month term of imprisonment and three-year term of supervised release. A:242-43.

After imposing conditions of release, the district court awarded restitution to the eight victims for whom the restitution amounts were stipulated, reserving decision on V-9. A:249-50. The court also granted the government's motion to dismiss

several counts of the indictment pursuant to the plea agreement. A:39, 250-51.

## SUMMARY OF ARGUMENT

The district court did not commit procedural error when imposing Roglieri's sentence. First, it properly applied a two-level enhancement under U.S.S.G. § 3B1.1(c) based on its finding that Roglieri was an "organizer, leader, manager, or supervisor" in his conspiracy. As the court observed, Roglieri was the founder and CEO of the two companies the conspirators used to conduct their fraud. There also was evidence that he decided which contracts the companies entered and once rebuked a co-conspirator for objecting to his decision. Roglieri likewise controlled the conspiracy's finances, including the payment of his co-conspirators. And he kept for himself "the lion's share" of the profit.

Second, the district court did not err by denying Roglieri a "zero-point offender" reduction under U.S.S.G. § 4C1.1. The Section 3B1.1(c) adjustment alone rendered Roglieri ineligible. Even if not, the district court did not plainly err in finding that Roglieri "personally cause[d] substantial financial hardship," which was an independent basis for withholding the reduction.

Third, the district court did not commit plain procedural error by discounting the Reign and Berone fraud as a mitigating factor. Roglieri cited his dealings with those companies as evidence that

he initially tried to operate a legitimate business and resorted to fraud only after he himself was the victim of it. The court disagreed, concluding that Roglieri's business was fraudulent from its inception. Roglieri argues that part of the district court's rationale was based on a misunderstanding of what he hoped to gain from the Reign and Berone deal. But even assuming that is true, the court cited other reasons that were independent of that misunderstanding and which undermined Roglieri's narrative. Those included Roglieri's lies to his clients and misappropriation of their funds starting before he became involved with Reign and Berone. Any error thus did not affect the sentence and was harmless. Or at least, Roglieri fails to establish that his substantial rights were affected.

The district court also imposed a substantively reasonable sentence. Roglieri defrauded his victims of over $55,000,000. He caused those victims significant harm. He enjoyed a luxurious lifestyle paid for at their expense. And he threatened to harm law enforcement. The bottom-of-the-guidelines sentence the court selected was not shockingly high. Further, contrary to what Roglieri contends, the district court was not required to disagree with the retributive policies reflected in U.S.S.G. § 2B1.1(b)'s loss enhancements. And even if those enhancements could, in some circumstances, produce unreasonable sentencing ranges, that was not the case here, where each dollar of loss reflected real harm to an actual victim.

Finally, the district court did not abuse its discretion by awarding restitution to V-9 in the amount of $9,800,326. To the extent that amount includes expenses V-9 incurred before entering into a contract with Prime Capital, that was appropriate as Roglieri's fraud forced the collapse of a development project that would have allowed V-9 to recoup those expenses. Roglieri has abandoned any challenge to the remainder of the restitution award. And there was no plain error even absent abandonment.

This Court should affirm the judgment of conviction in its entirety.

## ARGUMENT

### POINT I: Roglieri's Sentence Is Procedurally Reasonable.

### A. Governing Law

#### 1. Procedural Reasonableness Generally

"A sentence is procedurally unreasonable if the district court fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Jesurum*, 819 F.3d 667, 670 (2d

Cir. 2016) (emphasis removed).[7]

### 2. U.S.S.G. § 3B1.1

U.S.S.G. § 3B1.1 prescribes different offense level adjustments based on a defendant's "role in the offense." "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," then his offense level is increased by four levels. § 3B1.1(a). "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," then it is increased by three levels. § 3B1.1(b). "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity" in any other scenario, then a two-level enhancement applies. § 3B1.1(c).

"A defendant is considered a manager or supervisor if she exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Sow*, --- F.4th ---, No. 25-2621-CR, 2026 WL 3316039, at *3 (2d Cir. Nov. 3, 2026). "It is sufficient that the defendant only manages or supervises one other participant in the criminal

---

[7] Unless otherwise noted, citations to legal authorities and Roglieri's brief omit internal citations and quotation marks; internal alterations and omissions are accepted; and emphases are in the original.

activity for the enhancement to apply." *Id.* "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4.

"In distinguishing a leadership and organizational role from one of mere management or supervision, . . . [f]actors the court should consider include":

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. Courts, however, are not required to consider these factors when determining only whether a defendant is a manager or supervisor. *See United States v. Pristell*, 941 F.3d 44, 50-51 (2d Cir. 2019).

**3. U.S.S.G. § 4C1.1**

U.S.S.G. § 4C1.1 provides a two-level reduction to a defendant without any criminal history points if, among other things, he "did not personally cause substantial financial hardship" and "did not

receive an adjustment under § 3B1.1." § 4C1.1(a)(6) and (a)(10).

## B. Standard of Review

This Court "review[s] the procedural reasonableness of a sentence under a deferential abuse-of-discretion standard." *United States v. Vinales*, 78 F.4th 550, 552 (2d Cir. 2023). "This standard incorporates *de novo* review of questions of law . . . and clear error review of questions of fact." *Id.* "A finding of clear error is warranted only when [this Court is] left with the definite and firm conviction that a mistake has been committed." *United States v. Osuba*, 67 F.4th 56, 65 (2d Cir. 2023).

When a defendant failed to raise a claim of procedural error below, plain error review applies. *United States v. Verkhoglyad*, 516 F.3d 122, 128 (2d Cir. 2008). "[R]eversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)). To satisfy the plain error standard, a defendant must show a "clear or obvious" error that affected his substantial rights and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

Ordinarily, if this Court "identif[ies] procedural error in a sentence, but the record indicates clearly that the district court would have imposed the

same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Darrah*, 132 F.4th 643, 649 (2d Cir. 2025). "This rule places the burden on the government to make the requisite clear showing." *United States v. Barrett*, 102 F.4th 60, 86 (2d Cir. 2024), *cert. granted in part*, 145 S. Ct. 1307, *and rev'd in part*, 607 U.S. 128, *and opinion withdrawn in part*, 172 F.4th 210 (2d Cir. 2026). "If, however, the defendant forfeited a procedural challenge by failing to preserve it, it becomes his burden to demonstrate plain error by showing a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.*

### C. Discussion

#### 1. The district court correctly applied a two-level enhancement under U.S.S.G. § 3B1.1(c).

The district court correctly applied a two-level enhancement under U.S.S.G. § 3B1.1(c) as there was ample evidence that Roglieri was at least a manager or supervisor, if not a leader or organizer.

First, Roglieri was the CEO and sole member of Prime Capital and Prime Commercial, the businesses through which the fraud was conducted. PSR ¶ 41. That alone was compelling—if not conclusive—evidence of his leadership role in the conspiracy. *See United States v. DeRiggi*, 72 F.3d 7, 8-9 (2d Cir. 1995)

("[W]hen a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a four-level enhancement under § 3B1.1(a) is proper."); *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (reversing district court's refusal to apply leadership adjustment in part because court was "inappropriately dismissive of the significance of [defendant's] role as the president of" the company involved in the fraud); *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (reversing district court's refusal to apply leadership adjustment in part because defendant was owner of car dealership involved in money laundering); *United States v. Duncan*, 42 F.3d 97, 106 (2d Cir. 1994) (upholding leadership enhancement in part because defendant was president of company that served as "the primary vehicle through which corrupt payments were made").

Roglieri also exercised "decision making authority" commensurate with his title. U.S.S.G. § 3B1.1 cmt. n.4. For example, he was the signatory on the agreements between Prime Capital and its clients. PSR ¶ 48, 50, 59, 62; A:202 (district court noting same). And there was evidence he had final say over which agreements the company entered. When, for example, Humphrey pleaded with Roglieri not to sign a contract with Indigo in July 2022, Roglieri quickly overrode her. PSR ¶ 48; A:202. The tone of his response—"Get yourself under control. NOW"—further evidenced his superior role in the conspiracy's hierarchy. PSR ¶ 48; *see Pristell*, 941

F.3d at 50 (upholding finding that defendant was supervisor or manager in part because he "chastised" co-defendant).

Roglieri likewise controlled the conspiracy's finances and the distribution of its ill-gotten gains. He unilaterally executed multiple wire transfers moving millions of dollars worth of ICA Payments from their pledged accounts. PSR ¶¶ 51, 60, 63; A:202. He also paid his co-conspirators using funds taken from ICA Payments. PSR ¶ 53. And he bought the multi-million-dollar home where Humphrey lived and worked. PSR ¶ 54; A:202. Roglieri, in short, controlled who received what. *See Huerta*, 371 F.3d at 93 (citing defendant's oversight of payment to co-conspirators as factor potentially supporting Section 3B1.1(b) enhancement).

Finally, Roglieri "claimed [a] right to a larger share of the fruits of the crime" than his co-conspirators. U.S.S.G. §3B1.1 cmt. n.4. Roglieri received $55,484,674.84 in fraud proceeds. PSR ¶ 65. Accounts in Snyder's name received only around $615,500. PSR ¶ 67. Humphrey received only about $382,500. PSR ¶ 66. Even crediting the $3,800,000 Virginia Beach house Humphrey used and the $2,000,000 paid to a company associated with Humphrey, PSR ¶¶ 54, 63, Humphrey and Snyder received less than 13% of what Roglieri received. The district court thus correctly determined that Roglieri received "the lion's share" of the benefit. A:202. And because "persons who exercise a supervisory or managerial role in the

commission of an offense tend to profit more from it," U.S.S.G. § 3B1.1, background, it was reasonable to infer that Roglieri's profit was evidence of a least a supervisory or managerial role.

Roglieri argues that "[w]hile it is true . . . that the largest share of the fruit of the offense went to [him], no evidence established that [his] enrichment was the result of any 'claimed right.'" Br. 27 (quoting U.S.S.G. § 3B1.1 cmt. n.4). But it is unclear how else Roglieri could have amassed so disproportionate a benefit from the conspiracy if not by claiming a right to it. And his co-conspirators' apparent acquiescence shows that they agreed Roglieri was entitled to that compensation by virtue of his leadership role in the conspiracy. At least, it was not clear error for the district court to draw that inference.

Roglieri also reasons that Humphrey's objection to the Indigo deal "show[s] that Humphrey had authority at least equal to Roglieri, otherwise she would not have felt emboldened to direct his activities." Br. 28. But a subordinate can feel "emboldened" to raise objections and still be a subordinate. What matters is who has the authority to make the final decision. Here, that was Roglieri, as evidenced by Prime Capital's entering into an agreement with Indigo despite Humphrey's strenuous objection. PSR ¶ 48.

Finally, Roglieri claims that Humphrey "was more in charge of day-to-day operations, and

responsible for attracting borrowers and nailing down agreements." Br. 28. But he offers no evidence to support that claim, citing only defense counsel's bare assertion of the same in his objections to the PSR. *Id.*; PSR pg. 42. In any case, "[t]he fact . . . that [a] co-conspirator . . . played a larger role in the day-to-day management of the criminal activity . . . does not foreclose a finding that [a defendant] was also a 'leader' of the activity." *Wisniewski*, 121 F.3d at 58. Indeed, it can *support* such a finding. Minor operatives typically handle more routine tasks to allow leaders to focus on high-level strategic decisions. Humphrey's handling of "day-to-day" tasks thus reinforces the conclusion that she was Roglieri's subordinate.

The district court therefore did not err by applying a two-level enhancement under Section 3B1.1(c).

**2. Roglieri was ineligible for a reduction under U.S.S.G. § 4C1.1.**

The district court also correctly denied Roglieri a 2-level reduction under U.S.S.G. § 4C1.1.

**a. U.S.S.G. § 4C1.1(a)(10)**

First, a defendant is ineligible for that reduction if he "received an adjustment under § 3B1.1." U.S.S.G. § 4C1.1(a)(10). For the reasons explained above in Point I.C.1, the district court correctly applied an adjustment under Section

3B1.1(c). A:204. That alone rendered Section 4C1.1 inapplicable. *Id.*

**b. U.S.S.G. § 4C1.1(a)(6)**

Second, even if the Section 3B1.1 adjustment did not apply, the district court determined that Roglieri was ineligible for the reduction for an independent reason: "he personally caused a substantial financial hardship." A:204; U.S.S.G. § 4C1.1(a)(6). Roglieri challenges that determination on appeal. Br. 29-30. However, he never raised the issue below, despite the government arguing in a presentencing submission that Section 4C1.1(a)(6) rendered Roglieri ineligible for the reduction. A:181. He also stood silent at sentencing when the district court remarked that "[t]he defendant does not object to the conclusion that he personally caused a substantial financial hardship." A:204. Roglieri therefore waived any challenge on appeal. *Cf. United States v. Connearney*, No. 25-15, 2026 WL 1506585, at *2 (2d Cir. May 28, 2026) (summary order) (record "compel[led] the conclusion" that defendant waived objection in part because government raised issue in sentencing memorandum and defense counsel confirmed at sentencing that he had no objection). Even if not, his claim should at least be reviewed for plain error. And the district court did not err, plainly or otherwise.

Roglieri "does not dispute that the victims suffered substantial financial hardship as a result

of the offense." Br. 29. Instead, he argues that "the district court did not find, and the record does not establish, that he *personally* caused any hardship." *Id.* But the court *did* make that finding—it expressly stated that Roglieri "*personally* caused substantial hardship, pursuant to guideline 4C1.1[(a)(6)]." A:204 (emphasis added). Roglieri cites neither reason nor authority requiring the court to say any more, particularly given his failure to object.

Roglieri's substantive challenge is equally meritless. His argument is based on an unduly restrictive definition of the phrase "personally caused." By Roglieri's reading, the phrase "refers to direct actions, taken without intervention of others or without any intervening steps." Br. 29. Roglieri thus contends that if any portion of his fraud involved a co-conspirator taking some intermediate step—such as "attracting borrowers" or "nailing down agreements"—he did not "personally cause" the resulting harm. Br. 30.

This Court should reject Roglieri's cramped reading. First, the word "personally," as used in Section 4C1.1(a)(6), simply "ensures that in multi-defendant conspiracies, only the defendants that caused substantial financial hardship receive the enhancement, not mere co-conspirators who lacked direct involvement." *United States v. Irwin*, No. 24-10791, 2025 WL 2887995, at *2 (5th Cir. Oct. 10, 2025). In other words, the defendant should be accountable only for things he did, not things that his co-conspirators did. That distinction tracks the

two types of "relevant conduct" defined in U.S.S.G. § 1B1.3(a)(1). The first is conduct that a "defendant *personally* undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes." U.S.S.G. § 1B1.3(a)(1)(A) & cmt. n.3(D) (emphasis added). The second is the reasonably foreseeable conduct of co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B). Section 4C1.1(a)(6) makes clear that only the former can disqualify a defendant from receiving a reduction, not the latter.[8]

Second, the word "cause" means factual or "but for" causation. *See Irwin*, 2025 WL 2887995, at *2 (concluding, under plain error review, that Section 4C1.1(a)(6) required only but-for causation). "Congress knows how to include an explicit proximate cause requirement in a punishment enhancement" when it wishes. *United States v. Parks*, 179 F.4th 144, 152 (2d Cir. 2026); *see, e.g.*, 18 U.S.C. § 3663A(a)(2) (requiring that victim "be directly and *proximately* harmed" to be entitled to restitution under Mandatory Victims Restitution

---

[8] That distinction explains Application Note 1's instruction that "[t]he application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of § 2B1.1." Because Section 2B1.1(b)(2) places no restriction on what types of relevant conduct courts can consider when calculating loss amount, that calculation would include coparticipants' conduct reasonably foreseeable to a defendant. The Commission intended for Section 4C1.1(a)(6) to have a narrower scope.

Act (emphasis added) (discussed further *infra* in Point III)). And the Commission presumably knows how to do the same when drafting an exception to a downward adjustment. *See United States v. Rainford*, 110 F.4th 455, 499 n.8 (2d Cir. 2024) ("Our interpretation of the Sentencing Guidelines is governed by traditional rules of statutory construction."). Yet nothing in the text of Section 4C1.1(a)(6) purports to impose a proximate cause requirement. Moreover, U.S.S.G. § 4C1.1(b)(3) uses the phrase "resulted in" as a shorthand reference for the "cause" requirement in subsection (a)(6), suggesting the Commission regarded the phrases as interchangeable. And this Court has twice before held that similar causal language requires only but-for causation. *Parks*, 179 F.4th at 151-53 (interpreting 18 U.S.C. § 1201(a)'s sentencing enhancement for when death "results"); *United States v. Felder*, 993 F.3d 57, 68-70 (2d Cir. 2021) (interpreting similar language in 18 U.S.C. § 2119(3)).

Section 4C1.1(a)(6)'s meaning then is simple; if a defendant did something himself that resulted in substantial harm that would not have occurred but for his actions, he should not receive a two-level reduction. Whether intervening events contributed to a victim's harm is irrelevant so long as the defendant's personal actions were a necessary part of the causal chain that resulted in the harm. That makes sense; any other interpretation would permit conspirators to avoid Section 4C1.1(a)(6) simply by subdividing tasks between themselves. At the very least, it is not

clear or obvious that this interpretation is wrong, as reversal under plain error review requires.[9] *See United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (explaining that this Court "typically do[es] not find plain error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court").

Applying that definition here, the district court did not plainly err by concluding that Roglieri personally caused harm to his victims. Roglieri co-founded Prime Capital and was the CEO and sole member of Prime Capital and Prime Commercial. PSR ¶¶ 41-42. He also personally decided which agreements the company entered with its victims and signed the contracts. PSR ¶¶ 48, 50, 59, 62. And he personally lied to clients about how their ICA Payments would be used. PSR ¶ 47. Had he not done so, his victims never would have been defrauded. Thus, even if additional steps were necessary to complete the fraud, Roglieri still personally caused it.

Moreover, even if Roglieri's definition of "personally caused" was correct, the district court still would not have erred, let alone plainly. The PSR identifies at least one instance where

[9] To the extent *United States v. Daramola*, No. 20-CR-2124, 2024 WL 4241840 (D.N.M. Sept. 19, 2024) supports Roglieri's interpretation of the phrase "personally caused," Br. 29, it is of course nonbinding and not a basis for finding plain error.

Roglieri—and Roglieri alone—misappropriated a $5,000,000 ICA Payment, much of which he spent on luxury items for himself. PSR ¶¶ 62-63. There were no "intervening steps," Br. 29; Roglieri just stole money. And the theft caused the victim a substantial, multimillion dollar loss.

Finally, to the extent there is any ambiguity in the record over what harm Roglieri personally caused, it is to the government's benefit, not his. A defendant bears the burden of proof where a disputed guideline adjustment "has the effect of reducing the defendant's otherwise-applicable Guidelines range." *United States v. Wynn*, 108 F.4th 73, 80 (2d Cir. 2024). Roglieri therefore bore the burden of proving he was entitled to a reduction under Section 4C1.1. Accordingly, the question is not whether the record "establish[es] . . . that he personally caused" harm, Br. 29 (emphasis removed), but rather whether the record so conclusively proves otherwise that any contrary conclusion would have been plain error. For all the reasons stated above, Roglieri fails to establish that it does.

***

The district court therefore properly denied Roglieri a reduction under U.S.S.G. § 4C1.1.

**3. The district court properly discounted Roglieri's reliance on the Reign and Berone fraud.**

Roglieri next argues that the district court "based its sentence on a misunderstanding of" the fraud Reign and Berone allegedly perpetrated on him starting in October 2022. Br. 32. Roglieri claims this argument sounds in substantive unreasonableness. Br. 31. But because he is claiming the court based its sentence on an erroneous fact, procedural reasonableness is the correct framework.[10] *See Jesurum*, 819 F.3d at 670. And because Roglieri never raised this procedural challenge below, plain error review applies. *See Verkhoglyad*, 516 F.3d at 128.

At sentencing, Roglieri argued that the Reign and Berone fraud was evidence of his good faith. By his telling, he paid the companies $20,000,000 in the expectation they would help him generate "upwards of $500 million" in investment returns that he could have used to fund his clients' loans. Br. 32. Those companies "lulled Roglieri for more than a year into believing funding was forthcoming," only to defraud him. Br. 21. In the meantime, Roglieri defrauded his own clients by accepting ICA Payments for loans he knew he could not fund. Br. 33. But he claims he did so

---

[10] Roglieri acknowledges that some of his substantive arguments may be more appropriately characterized as procedural, and vice versa. Br. 31 n.1.

believing the funding would eventually come through and that he would be able to "make things right." Br. 33.

The district court rejected that narrative. It concluded that Roglieri intended to defraud his clients from the moment he founded Prime Capital and was motivated purely by greed. A:229-33. It also determined that Roglieri's dealings with Reign and Berone were not "an important part of [the] story." A:232. One reason it gave in support was that the "$20 million line of credit" Roglieri sought from Reign and Berone "could not possibly have funded all of the loan agreements that [he] made," meaning Roglieri knew he could not have provided the loans he promised even if he was not defrauded. A:231-32. On appeal, Roglieri argues that the court erred in that regard because he expected "upwards of $500 million" from Reign and Berone, not just a "$20 million line of credit." Br. 34-35. And he claims that, had his investment generated those returns, they would have funded all his loan obligations. Roglieri therefore argues that the court improperly rejected one of his principal arguments for leniency. Br. 34-37.

His claim is meritless. As an initial matter, there was ample reason to doubt whether Roglieri truly believed his dealings with Reign and Berone could have generated "upwards of $500 million." Roglieri never explained how he expected to generate those returns, apart from vaguely referring to "execut[ing] trades" and unspecified "investment activity." A:125. Certainly, a 2,500%

guaranteed return would have been extraordinary, even for a long-term investment. And Roglieri typically was required to start funding loans about four months after signing. PSR ¶ 44.

Regardless, even assuming the truth of Roglieri's claims, as the district court did, and even assuming the court incorrectly believed that Roglieri stood to receive just a "$20 million line of credit" from Reign and Berone, any error was harmless. The district court cited other compelling reasons for its conclusion that Roglieri acted in bad faith. And those reasons were independent of the Reign and Berone transaction. The record therefore makes clear the district court would have imposed the same sentence even absent the claimed error. *See Darrah*, 132 F.4th at 651; *United States v. Moore*, 975 F.3d 84, 93 (2d Cir. 2020) (no harm to defendant's substantial rights where, despite district court's factual misstatement, "the thrust of the court's observation remains valid"); *United States v. Escobosa*, 791 F. App'x 214, 216 (2d Cir. 2019) (affirming despite assuming factual error because "[t]he court's primary focus when discussing the need for the sentence imposed" was "conduct that [the defendant] does not deny and which is independent" of the error).

First, the district court correctly observed that Roglieri's fraudulent conduct began before he "got involved with Berone and Reign." A:232. For example, in May 2022, Roglieri posted a video falsely claiming to have funded a hotel project in

Atlanta.[11] PSR ¶ 15. That was about five months before he made the $20,000,000 payment to Reign on October 24, 2022. PSR ¶ 52. Rolgieri also entered into a contract with Indigo in July 2022 promising funding that Humphrey warned him they did not have. PSR ¶ 48. And starting in early October 2022, Roglieri began using another client's ICA Payment to fund Indigo's loan. PSR ¶ 51. That showed Roglieri did not "set out to help his clients achieve success" as he claims. Br 34-35. From the outset, he operated what the district court aptly described as a "Ponzi scheme." A:229.

The district court also examined Roglieri's conduct predating even his founding of Prime Capital. It noted tax liens issued against him in 2014 and 2017 totaling over $400,000. A:233. And it observed that a $100,000 civil judgment entered against him in 2015. *Id.* All that reaffirmed the court's conclusion that Roglieri's "business model has been off from day one." *Id.*

Finally, the district court repeatedly and extensively focused on Roglieri's self-indulgence using client funds. A:230-31, 235-41. That included his using client money to buy an $84,000 Rolex watch and private jet travel, even after several clients started involuntary bankruptcy proceedings against Prime Capital in December 2023. PSR ¶¶ 61-63. As the court implicitly recognized, that spending rendered the Reign and

---

[11] The district court mistakenly stated that the video was posted in 2021. A:232.

Berone fraud largely irrelevant. Because even assuming those entities defrauded Roglieri, that did not explain why Roglieri misappropriated the funds he had not lost and why he used that money to enrich himself. As the court observed earlier in the sentencing hearing, the money Roglieri spent on cars and watches "could have gone back into the pocket" of his clients. A:213. And if Roglieri truly was trying "to make things right," Br. 33, that is the use to which he would have put it.

Accordingly, even assuming the district court's reference to the "$20 million line of credit" was wrong, the court offered independent and compelling reasons for concluding that the Reign and Berone fraud was not a mitigating factor. Given the court's comprehensive discussion of these reasons, and its emphatic insistence that Roglieri was "the face of a bottomless pit of greed," A:233, the record makes clear that the court would have made the same assessment, and imposed the same sentence, even absent the alleged error. At the very least, Roglieri fails to meet his burden of establishing otherwise, as reversal under plain error review requires. *See Verkhoglyad*, 516 F.3d at 128.

## POINT II: Roglieri's Sentence Is Substantively Reasonable.

### A. Governing Law and Standard of Review

When reviewing a sentence for substantive reasonableness, this Court "assesses the length of

the sentence imposed in light of the § 3553(a) factors," *Verkhoglyad*, 516 F.3d at 127, and must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts," *Wynn*, 108 F.4th at 85.

"A defendant challenging the substantive reasonableness of his or her sentence bears a heavy burden because [this Court's] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Spoor*, 904 F.3d 141, 156 (2d Cir. 2018). This Court sets aside "only those sentences that are so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing them to stand would damage the administration of justice." *United States v. Muzio*, 966 F.3d 61, 64 (2d Cir. 2020). This Court does not "reweigh the relevant factors," but rather evaluates "only whether a factor can bear the weight assigned it by the District Court under the totality of circumstances in the case." *United States v. Albarran*, 943 F.3d 106, 116 (2d Cir. 2019).

A defendant who, like Roglieri, was convicted under 18 U.S.C. §§ 1349 and 1343, for an offense unrelated to disaster relief and not affecting a financial institution, faces a maximum prison term of 20 years. *See* 18 U.S.C. § 1343.

**B. Discussion**

The district court imposed a substantively reasonable sentence. As the district court explained at Roglieri's sentencing, there were numerous aggravating circumstances. Roglieri defrauded at least 10 victims of more than $55,000,000. A:242; PSR ¶ 79. He caused many of them substantial economic hardship. A:239-41; PSR pgs. 44-186. While they suffered, he enjoyed a luxurious lifestyle funded with the money he stole. A:230-31, 240-41; PSR ¶¶ 30, 63. And when investigators closed in on Roglieri, he threatened to kill anyone "that comes after me." A:227-28; PSR ¶¶ 76-77. At the same time, the court acknowledged mitigating factors, including Roglieri's lack of criminal history and charitable endeavors. A:241. After weighing those factors, it imposed a sentence at the bottom of the guidelines imprisonment range and about 40% of the statutory maximum. A:243. That sentence was not "shockingly high." *Muzio*, 966 F.3d at 64.

Roglieri argues that the district court failed to "carefully treat" the guidelines range calculated under U.S.S.G. § 2B1.1, a guideline which he contends places an inordinate emphasis on the loss resulting from an offense. Br. 38-45. To the extent he faults the court for not considering or addressing this argument at sentencing, Br. 44, he again is raising a claim of unpreserved procedural error. And he fails to establish any error, much less plain error. This Court "presumes that the sentencing judge has considered all relevant

§ 3553(a) factors and arguments unless the record suggests otherwise," *United States v. Rosa*, 957 F.3d 113, 118 (2d Cir. 2020), and nothing rebuts that presumption here. A district court also is not "required to explain its reasoning for rejecting a challenge to the merits of a Guidelines provision." *United States v. Griswold*, No. 23-7806-CR, 2024 WL 4601448, at *2 (2d Cir. Oct. 29, 2024) (citing *United States v. Thomas*, 628 F.3d 64, 72 (2d Cir. 2010)); *see also United States v. Salim*, 690 F.3d 115, 127 (2d Cir. 2012) (holding district court did not procedurally err by "not directly reject[ing defendant's] argument that [court] ought to ignore [a guidelines] terrorism enhancement" on policy grounds), *superseded on other grounds by* the CARES Act, Pub. L. No. 116-136, § 15002(b), 134 Stat. 281, 528-29 (2020); *United States v. Bonilla*, 618 F.3d 102, 111 (2d Cir. 2010) (district court did not err by not directly responding to defendant's policy objection).

Roglieri's substantive challenge fares no better. Although a "judge *may* give a non-Guidelines sentence where she disagrees with the weight the Guidelines assign to a factor," this Court "ha[s] never held that a district court is *required* to reject an applicable Guideline." *Salim*, 690 F.3d at 126 (emphasis added); *see also United States v. Lawrence*, 139 F.4th 115, 122-23 (2d Cir. 2025) (substantially same). There is no reason to make an exception for Section 2B1.1. The loss enhancements in that guideline "have foundations in empirical data and national experience related to the goals of fair sentencing and retribution" in

that they are calibrated "'to avoid disparity between white collar and blue collar crime.'" *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018) (quoting Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sentencing Reporter 180, 181 (1999)). And while Roglieri claims there is no empirical evidence that the enhancements achieve deterrence, Br. 41, "deterrence is not the only goal" of sentencing, *Moose*, 893 F.3d at 958. Equally important are "the retributive purposes of sentencing." *Id.* at 957; 18 U.S.C. § 3553(a)(2)(A). And common-sense dictates that a defendant who takes or intends to take more money from victims typically deserves a harsher punishment than one who takes less. It therefore is reasonable for a district court to agree with the Sentencing Commission's judgment embodied in the loss enhancements. *See Moose*, 893 F.3d at 959 ("As we have made clear, district judges are as free to disagree with the policy behind the loss amount enhancement [in Section 2B1.1] as they are with any other guideline. But we have also made clear that sentencing judges may choose to follow them . . . ."); *United States v. Okunola*, No. 25-1074, 2026 WL 37683, at *6 (6th Cir. Jan. 6, 2026) ("A district court may vary from the Guidelines and impose a different sentence if it disagrees with the Sentencing Commission's views. . . . However, there is no indication that the district court had any such policy disagreement with the fraud Guidelines. And even if it did harbor some disagreement, the court was not required to reject the Guidelines range altogether"); *United States v. Brunson*, 482 F. App'x 811, 821 (4th Cir. 2012)

("[T]he district court acted within its discretion when it declined to embrace the policy disagreements [with the fraud guideline] raised by the Appellants.").

Further, even if Section 2B1.1 could in some instances produce unreasonable sentencing ranges, that did not happen here. While this Court has suggested a guidelines range could be problematic when based on a large *intended* loss, *see United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013); *see also id.* at 378-82 (Underhill, D.J. concurring), Roglieri's range was based entirely on the *actual* losses he inflicted on his victims. And whatever problems there may be with actual loss as a sentencing factor generally, Br. 41-42, the losses here are a strong indicator of the "moral seriousness," *id.* at 42, of Roglieri's offense. They represent businesses destroyed, retirement savings lost, lives disrupted, and a range of other concrete harms Roglieri's victims were forced to endure. *See, e.g.*, A:239-41; PSR ¶ 86; PSR pgs. 44-186; *see also Corsey*, 723 F.3d at 381 (Underhill, D.J. concurring) (explaining that "not all actual loss is equally serious" and that a loss which impacts victims more severely warrants greater weight in the Section 3553(a) analysis). The court properly imposed a sentence commensurate with that harm.

Roglieri's reliance on *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), Br. 43-44, is misplaced. In *Algahaim*, this Court simply noted some of what it considered to be the unusual

aspects of Section 2B1.1 and stated that district courts were "entitle[d] . . . to consider a non-Guidelines sentence" when sentencing fraud defendants. *Id.* at 800;[12] *see also Moose*, 893 F.3d at 959 (noting limited scope of *Algahaim*'s holding). But there is no indication the district court here misunderstood its authority to impose a below-guidelines sentence. Indeed, the thoroughness of its explanation at sentencing proves the opposite. The court discussed Roglieri's offense conduct, threats of violence, and past legal problems. A:226-33. It described the harm he inflicted on his victims. A:239-41. It contrasted that harm with Roglieri's extravagant purchases. A:230-31, 240-41. And it cited cases imposing comparable sentences. A:234-35. The court thus took pains to engage in a holistic analysis specifically tailored to Roglieri's unique circumstances. It did not reflexively apply the applicable guidelines range.

---

[12] Notably, *Algahaim* suggested the more usual approach would be a relatively higher base offense level with upward and downward adjustments rather than a lower base offense level with enhancements. 842 F.3d at 800. Yet Roglieri fails to explain why that approach would necessarily have resulted in him receiving a lower guidelines range. The Commission could have prescribed the same range, or even a higher range, by relying on a higher base offense level and fewer enhancements.

Roglieri argues that "the loss enhancement was not an adequate measure" of intended harm because he "never intended to permanently deprive his clients of their money." Br. 44-45. But he *did* intend permanent deprivation; he took client money from what were supposed to be restricted accounts and spent it on himself. To be sure, Roglieri claims that he hoped, through some quixotic investment scheme, to at some point make that money back. But even if that were true, there was still a permanent deprivation—the money Roglieri took was gone. In any case, as explained above in Point I.C.3, the district court found that this was never Roglieri's intent; his business was fraudulent from its inception. And the evidence it cited supports that conclusion.

Finally, Roglieri argues that the district court "failed to fully account for [his] considerable history of charitable works." Br. 36. But the district court expressly acknowledged Roglieri's "past generosity and other acts of kindness." A:241. Roglieri no doubt would have preferred that the court have given that generosity more weight. But "[t]he weight to be afforded any sentencing factor is a matter firmly committed to the discretion of the sentencing judge and is beyond [this Court's] review, as long as the sentence ultimately imposed is reasonable." *United States v. Bleau*, 930 F.3d 35, 42 (2d Cir. 2019). As explained, the district court's 97-month prison term fell within the range of permissible decisions.

Roglieri's sentence therefore was substantively reasonable.

## POINT III: The District Court Did Not Abuse Its Discretion in Awarding V-9 Restitution.

### A. Relevant Facts[13]

"V-9 was one of the companies defrauded by" Roglieri. A:267. On April 6, 2023, it entered into a Development Line of Credit Agreement ("DCLA") with Prime Capital in which Prime Capital agreed to loan V-9 more than $17,000,000 to build an affordable housing project in Nashville, Tennessee. A:262, 264-65, 267-68; PSR pg. 44. V-9 also paid Prime Capital an ICA Payment and due diligence fee, which together totaled $4,352,500. A:262. Prime Capital never made the loan. A:262, 265. And while it promised it would refund the ICA Payment in the event of a default, it never did. A:265. The project failed as a result. A:240 (referring to V-9 in third paragraph), 262; PSR pgs. 44-45.

---

[13] Throughout this section, the government relies on factual assertions in V-9's submissions to Probation, the parties' letter briefs addressing restitution, and the district court's restitution order. None of these facts were disputed below, and Roglieri does not challenge them on appeal.

Before Roglieri's sentencing, V-9 submitted a financial impact statement and spreadsheets, PSR pg. 46; GA:1-7,[14] seeking five categories of losses:

- the unrefunded ICA Payment and due diligence fee ($4,352,500), A:262; GA:1 (line 12);

- expenses V-9 incurred for earnest payments; broker costs; architectural, engineering, and legal fees; appraisals; environmental studies; "pursuit costs"; and other miscellaneous expenses *before* it entered into the DCLA with Prime Capital on April 6, 2023 (about $1,138,952)[15] ("pre-contact property expenses");

---

[14] The government has included in its proposed sealed appendix a PDF version of the Excel spreadsheets the government emailed to the district court addressing V-9's losses. The government reformatted the spreadsheets to make them easier to read, including by adding columns with row numbers, changing column sizes, wrapping text, and adding borders. But the content is the same. The spreadsheets appear to be substantively identical to the spreadsheets that Roglieri supplied to this Court in a confidential submission.

[15] Most of these costs are set out in lines 1-11 and 13-17 on page 1 of the government appendix.

- expenses V-9 incurred for similar expenses *after* it entered into a contract with Prime Capital (about $793,941), GA:1-2 (sum of lines 18-40 and 47) ("post-contract property expenses");

- expenses V-9 incurred in connection with a $5,000,000 short-term loan it took out to fund the ICA Payment, including a $150,000 origination fee and $3,364,932 in interest incurred on the loan as of January 20, 2026, *see* GA:2 (line 41) and 6 ("loan expenses"); and

- V-9's projected earnings and investment returns following the project's completion ($15,615,440), GA:2 (lines 42-46), 7 ("projected returns").

In a letter brief, the government argued that V-9 should be compensated for all but the projected returns. A:262-63 & 263 n.2. Roglieri agreed to pay V-9 $5,000,000, which he said compensated V-

---

The pursuit costs are approximately $647,500: the $5,000,000 in line 12 minus the "$4.3M escrow," which appears to reference the $4,352,500 of ICA and due diligence payments. Alternatively, the "4.3M" may reference only the ICA Payment, and line 16 may reference the due diligence payment. But either reading produces the same $1,138,952 total.

9 for the lost ICA Payment and took "into account the potential interest and conservative returns" that amount could have yielded. A:265. But he argued he should not have to pay the "$5,491,452.00 in expenditures [V-9 incurred] *before* the [DLCA] was executed" because neither party was required to go forward with the agreement at the time those expenses were incurred.[16] *Id.*

In its written order, the district court awarded V-9 $9,800,326, which is the approximate sum of the ICA and due diligence payments, pre-contract project expenses, post-contract project expenses, and loan expenses.[17] A:266-71. After summarizing the facts, governing law, and parties' positions, the court explained, in relevant part:

> The interest V-9 has paid on the loan it took out to fund the initial payment to Prime Capital is compensable. Likewise, the money spent on legal fees, environmental

---

[16] The $5,491,452 figure is wrong. Roglieri appears to have derived that number by adding lines 1-17 on the chart on pg. 1 of the government's appendix. But that includes the ICA Payment (line 12), which Roglieri conceded owing.

[17] The district court's award is two dollars more than the figure the government requested, A:262, and a dollar more than the total of the first four bullets on pages 54 and 55 of this brief. The reason for these discrepancies is unclear.

> tests, and property assessments before V-9 entered into a contract with Prime Capital is compensable. V-9 would not have taken out the loan or undertaken any of those expenses if it knew [Roglieri's] conduct was fraudulent. However, the Court concludes otherwise as to the potential investment returns and closing fees identified by V-9. There is insufficient evidence before the Court to conclude that those loss amounts are "actual" and caused by Defendant's conduct.

A:270.

**B. Governing Law**

The Mandatory Victims Restitution Act ("MVRA") requires restitution for any property crime "committed by fraud or deceit" where "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). "[T]he purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011). For a loss to be compensable, a defendant's offense must be the "cause-in-fact and proximate cause" of it. *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). "Regarding cause in fact, the defendant's conduct must have been a necessary factor in bringing about the victim's harm." *Id.* "Regarding proximate cause . . . [t]he

basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct, which [this Court] evaluate[s] based on whether that harm was foreseeable to a defendant." *Id.*

The government bears the burden of proving the amount of restitution owed by a preponderance of the evidence. 18 U.S.C. § 3664(e). But a district court's restitution calculations need not be "mathematically precise"; "a reasonable approximation will suffice." *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013).

**C. Standard of Review**

This Court "review[s] an order of restitution deferentially, and . . . will reverse only for abuse of discretion." *United States v. Aumais*, 656 F.3d 147, 151 (2d Cir. 2011). "Review of restitution orders is extremely deferential because ordering restitution requires a delicate balance of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch." *Rainford*, 110 F.4th at 490. If a defendant fails to raise an objection to a restitution order in the district court, plain error review applies. *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016).

## D. Discussion

### 1. V-9's pre-contract project expenses

Roglieri argues that he should not be responsible for paying V-9 restitution for the "legal assistance" and "site preparation" V-9 spent "prior to entering into agreements with Prime Capital"—that is, the approximately $1,138,952 in "pre-contract project expenses"—because those losses were not the "result of the fraud." Br. 22. He is mistaken.

First, Roglieri was the factual cause of the losses that the pre-contract project expenses represent. V-9 incurred those expenses to fund a construction project that it expected would allow it to eventually recoup those expenses. *See* GA:7; A:265 (Rolgieri acknowledging same in letter brief). To finance the project, V-9 turned to Roglieri and Prime Capital. Prime Capital promised to provide the funding V-9 required. But instead, Roglieri stole about $4,352,500 worth of collateral and prepaid interest. A:262, 265. That left V-9 without financing. And it also stripped V-9 of funds that it could have used to secure funding from another lender. Those actions caused the project to fail. A:240, 262; PSR pg. 44. And that left V-9 responsible for expenses that it no longer had any prospect of recovering. PSR pg. 44.

Second, Roglieri was the proximate cause of that harm. Roglieri was in the business of making loans for "larger scale" "commercial development

projects." PSR ¶ 82. He therefore knew his clients were incurring large development-related expenses. And it was foreseeable to Roglieri that stealing millions of dollars from a client at the beginning of a project could cause it to fail, forcing the client to take a loss on expenses incurred. Moreover, Roglieri charged clients tens of thousands of dollars to conduct due diligence into their projects. PSR ¶ 43. Roglieri therefore either knew of the specific expenses V-9 incurred, or likely would have known of them had he complied with his contractual obligations.

Roglieri objects that V-9 "would have incurred [the pre-contract project expenses] even had it never been aware of Prime Capital." Br. 49. But even assuming that is true, but for Roglieri's fraud, V-9 still would have had a financially viable project capable of recovering those costs. Roglieri was the reason it did not.

Contract law provides an instructive analogy. Ordinarily, if a borrower sues a lender for failing to make a loan, it is entitled to no more than the difference, if any, between the promised interest rate and the market rate. *See* 25 Williston on Contracts § 66:100 (4th ed. 2026). The reason is that a borrower typically can obtain funding from a different lender. *Id.* But if a lender impairs a borrower's ability to obtain alternate funding, the borrower can recover "heavier damages." *See* Restatement (Second) of Contracts § 351, cmt. (e) (1981). The Restatement provides the following example:

> A contracts to lend $1,000,000 to B for the stated purpose of enabling B to build a building and takes property of B as security. After construction is begun, A refuses to make the loan or release the security. Because B lacks further security, he is unable to complete the building, which becomes a total loss. B's loss incurred in partial construction of the building was foreseeable by A at the time of the contract as a probable result of the breach [and thus recoverable].

*Id.* at illust. 15. The lender's encumbrance of the borrower's collateral in that example rendered the borrower unable to complete its project. Roglieri's outright theft of V-9's collateral and pre-paid interest did the same to V-9. And although the recoverable construction costs in that example were incurred after the loan, that makes no difference. Either way, the lender deprived the borrower of its ability to seek full funding, thus rendering the project a "a total loss."

Of course, contract law allows for some types of damages that criminal restitution does not. That includes "expectation damages"—*i.e.*, damages that "strive to place an aggrieved party in the same economic position it would have been in had both parties fully performed their contractual obligations." *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006). But the pre-contract project expenses are not expectation damages.

Reimbursement for those expenses was not intended to put V-9 in the position it would have been in had Prime Capital complied with its contractual obligations and funded its loan. It was to put V-9 in the position it would have been in had it never met Prime Capital at all—a scenario in which it would never have lost the $4,352,500 prepayment and could have used that money to obtain financing from a legitimate source.

The district court therefore did not abuse its discretion by ordering Roglieri to pay restitution in the amount of the pre-contract project expenses.

**2. V-9's other losses**

In addition to challenging the district court's award of restitution for the pre-contract project expenses, Roglieri broadly asserts that "any restitution award for V-9 should be limited to the losses associated with the payments it made to Prime Capital, which falls in line with the $5 million amount Roglieri consented to pay." Br. 47-48. That appears to exclude not only the pre-contract project expenses, but also at least some portion of the post-contract project expenses and loan expenses. However, Roglieri makes no argument for why those latter expenses were improper. He therefore has abandoned any challenge to them. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some

effort at developed argumentation, are deemed waived.").

Even if Roglieri had not abandoned the argument, he did not preserve it in the district court, where, as on appeal, he never argued that the post-contract project and loan expenses were improper. A:264-65. And the court did not err by requiring Roglieri to pay those costs, plainly or otherwise.

The post-contract project expenses were appropriate for the same reasons as the pre-contract project expenses. But in addition, because the expenses were incurred *after* V-9 entered into the DCLA with Prime Capital, they also were recoverable on the theory that V-9 made those expenditures in reliance on Prime Capital fulfilling its loan obligations. In other words, not only did Roglieri deprive V-9 of the ability to recoup these expenses, but for Roglieri, it may never have incurred them at all.

Similarly, V-9 paid the origination fee for its short-term loan after entering into the DCLA and would not have done so but for Roglieri's fraud. GA:2 (line 41). Further, Roglieri's fraud was the direct cause of the interest V-9 accrued on that loan; had Roglieri not stolen the ICA Payment, V-9 could have used it to repay the principal and stopped accruing the interest. GA:6. Moreover, Roglieri could have foreseen that his clients would require loans to fund ICA Payments given the size of those payments. Or at least, he would have if he

had fulfilled his promise to conduct the requisite due diligence. He therefore was the proximate cause of the resulting harm.

***

The district court's $9,800,326 restitution award was proper.

However, in the event this Court finds some portion of it was improper, it should remand to the district court for further analysis. Because the district court found most categories of loss compensable, it had no reason to calculate the precise amounts attributable to each category. Therefore, in the event of an adverse ruling, a remand would be required to allow the court to complete that task.

## CONCLUSION

The judgment of conviction should be affirmed in all respects.

Dated: Syracuse, New York
November 9, 2026

Respectfully submitted,

TODD BLANCHE
*Attorney General*

JOHN A. SARCONE III
*First Assistant U.S. Attorney*
*Northern District of New York*
*Attorney for Appellee*

s/ *Thomas R. Sutcliffe*
By: THOMAS R. SUTCLIFFE
*Assistant United States Attorney*

JOSHUA R. ROSENTHAL
*Assistant United States Attorney*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned counsel for the United States hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B) and Local Rule 32.1. As measured by the word-processing system used to prepare this brief, there are approximately 13,574 words in the brief.

TODD BLANCHE
*Attorney General*

JOHN A. SARCONE III
*First Assistant U.S. Attorney*
*Northern District of New York*

s/ *Thomas R. Sutcliffe*
By: THOMAS R. SUTCLIFFE
*Assistant United States Attorney*

**CERTIFICATE OF SERVICE**
**BY NEXTGEN ACMS**

UNITED STATES OF AMERICA
v.
ROGLIERI

Docket Nos. 26-960 (L), 26-1289 (con)

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of New York, and is a person of such age and discretion as to be competent to serve papers.

She further certifies that on November 9, 2026, she served a copy of the appellee's Brief on the United States Court of Appeals for the Second Circuit and counsel for appellant, James Egan, AFPD, by uploading to the Second Circuit's ECF system a Portable Document Format (PDF) version of the Brief, and emailing PDF version of the Confidential Appendix to the same.

s/ *Deanna Lieberman*
Deanna Lieberman